## HEDDEN vs. HEDDEN.

1. Unsupported evidence by an alleged paramour as to a wife's ante-nuptial incontinence, is insufficient to overcome her positive denial. Even if fully proved, such incontinence would be no foundation for a divorce, nor admissible to support proof of her subsequent adultery.

2. A husband who connives at or assents to adultery by his wife with one person, will be deemed as assenting to it with others, and will not be entitled to a divorce for a subsequent act of adultery with a different person. It will not affect the case, that the act of adultery at which the husband connived was not committed.

3. If a husband sees what a reasonable man could not see without alarm, or if he knows that his wife has been guilty of ante-nuptial incontinence, or if he has himself seduced her before marriage, he is called upon to exercise peculiar vigilance and care over her, and if he sees what a reasonable man could not permit, and makes no effort to avert the danger, he must be supposed to see and mean the result.

4. He is not discharged from the exercise of such vigilance by the fact of his having deserted his wife and all his marital obligations for three years, or his having obtained a divorce in another state. If the marriage relation exists in this state, so that he can complain of a violation of its obligations, he cannot claim advantage of his wife's incontinence, when caution on his part would have prevented it.

*Quære.* Whether desertion for three years, under circumstances which entitled the defendant to a divorce before the commencement of complainant's suit, and before any adultery proved against defendant, would bar the complainant.

This cause came on for final hearing, upon the pleadings and proofs.

*Mr. Keasbey,* for complainant.

THE CHANCELLOR.

The bill states that the complainant was married to the defendant, his wife, in Newark, June 13th, 1864; that he was under twenty, and she eighteen years of age; that he was compelled by the father of the defendant to marry her, on account of his previous illicit intercourse with her, which

had come to the knowledge of her father; that after the ceremony he never lived with her, or had any connection with her; that a child was born about four months after the marriage.

That at some time not specified, after the marriage, he discovered that she had been guilty of illicit intercourse with other men before he became acquainted with her, and that she was a common prostitute.

That after the marriage ceremony he resided for a year in Newark, and then removed to the state of Indiana; and after having resided there for one year, he commenced proceedings in a county court of Common Pleas for a divorce, and in March, 1867, obtained a decree of divorce from the defendant, which decree he admits to be void and of no effect within this state, for the reason that the defendant was not within the jurisdiction of the court, was never served with process, and never appeared in the suit.

That upon his return to Newark in 1867, proceedings were instituted against him by the city authorities, under the supplement to the vagrant act, approved March 4th, 1864, for the purpose of compelling him to support his wife and child; that the justices, on said application, and the Quarter Sessions, on an appeal by him from the justices, held the decree of divorce void, and adjudged him to pay a weekly stipend; that this judgment was removed by him, by certiorari, to the Supreme Court, where the matter is still pending.

That after these proceedings were commenced, and sometime between the 1st of January and the 1st of October, 1868, the defendant committed adultery with one James M. Clark, and for this he prays he may be divorced.

The defendant, in her answer, admits the marriage at the time stated, admits the ante-nuptial illicit intercourse with the complainant, and the birth of a child soon after the marriage, which she answers was the result of that intercourse. She admits that since the marriage, as is charged by the bill, she had lived with and been supported by her father.

She denies that the complainant was compelled to marry her, but alleges that it was his own proposition upon discovering her situation. She denies that he did not, after the marriage ceremony, live with her, or have any connection with her, but alleges that for some months afterward he lived and cohabited with her at her father's house, and was there received and treated as her husband and a member of the family. She denies all ante-nuptial intercourse with any one besides the complainant, and that she has, since her marriage, ever committed adultery with James M. Clark, or any one else, and avers that she has always lived a pure and chaste life, except her ante-nuptial intercourse with the complainant. She admits the proceedings under the vagrant act, and the ruling of the courts as to the Indiana divorce. She also admits the youth of the complainant, and her own age, as stated in the bill.

The case of the complainant, as stated by him, does not present itself as one entitled to much favor in a court of equity. He debauched a girl of eighteen, was not willing to make the amende of marriage until threatened by her father either with legal proceedings or other steps; then he pledged himself to the injured one, by the most solemn rite of law and religion, to be her husband, and to support, cherish, and protect her, with the deliberate intention of doing neither; he immediately abandoned her, neither supported nor cohabited with her, and let her bear his child without his presence or recognition. After a year he went privily to Indiana, placed on the judicial records there a charge of adultery, which he does not here allege or attempt to prove was true, and in a proceeding of which she had no knowledge, and in which she could make no defence, branded her as an adulteress on the judicial record of that state; that it was upon "due proof" as alleged, only means that the proof was such as did, or ought to, satisfy the court; that the evidence was true is not alleged, nor will it be presumed, because, if true, it would have procured for him a divorce in this state that would have been valid everywhere, and that

without the necessity of a year's sojourn in Indiana. After his return, and two successive decisions against his attempt to evade his duties as a husband and a father, this woman whom, with her child, he had abandoned for four years, and left to apply to the overseers of the poor for relief, was guilty of adultery. He knew and had tested the strength of her passion and the weakness of power to resist; he knew of her destitution and poverty. Had he performed his duty as a husband, she would have been protected from the perils to which she was thus exposed. After having withstood these trials for nearly four years, she fell. And the complainant now applies for a divorce, not because this adulterer has destroyed his domestic peace, or robbed him of the *consortium* and society of a wife whose bed he never had shared, whose home he never had entered, but to get clear of the claims of the public upon him for the support of his wife and child, for which the Indiana divorce was not equal. He had for more than four years deserted his wife, and by the law of the state had forfeited his marital right over her at her option, for she was at any time entitled to a decree for a dissolution of the marriage, with proper alimony. This is the complainant's case upon his own showing. I throw out the charges of ante-nuptial unchastity and being a common prostitute, as scandalous and mere abuse, being without names or circumstances, and alleged in such manner that they might be struck out of the pleadings.

The proof, in one respect, shows a much better case for the complainant than is set out in the bill. It appears by the weight of evidence, that he lived with his wife for some months after his marriage, at least until after the birth of the child; that he stayed with her several nights each week, occupying the same room and bed; that he was present and gave proper assistance at the birth of his child; went for the physician and paid him. How long this continued, is not shown with any degree of clearness by the testimony; I think I will be safe in assuming it to have been for six or eight months after the marriage. It does not appear, even

by allegations in the bill, why he then left her. The complainant has not been sworn, and no witness alludes to the matter. If it appeared that he was induced to leave her from credible information of her ante-nuptial incontinence, it might be, in some degree, an excuse in morals, though none in law.

Such incontinence is attempted to be proved by William F. Rankin, the person with whom it is charged to have been committed. He swears to it clearly and positively, and that it was repeated several times. But his evidence is unsupported by any other proof. It is the evidence of an accomplice in the alleged crime, always suspicious. In criminal proceedings such evidence is admitted, but cautious judges do not allow a conviction on the unsupported evidence of an accomplice. In this case, this charge is made improbable by the evidence of the sister and father of the defendant. And the evidence of Rankin is positively contradicted by the defendant herself. She is, to be sure, a party to the suit, and this must be allowed to weigh against her credibility.

The mere charge of adultery, even if proved, does not, in law, affect her credibility. If she had been shown as charged, to be a common prostitute, that might and would have great influence upon the reliance which would, in fact, be placed upon her testimony. But there is no proof whatever that she has ever prostituted herself even to James M. Clark, who once let her have $4, and once paid a bill of $2 to a doctor. It does not appear for what the $4 was paid, and if the facts attempted to be connected with the doctor's bill are true, that was in no sense wages to her. There is no pretence of proof that she was a *common* prostitute. As she stands, I cannot give any preference to the testimony of Rankin, who, in addition to being an accomplice in the crime, must bear the load of the moral perfidy which always attaches to the breach of the promise not to betray, implied, when a girl of seventeen, in the house of her father, yields to an apparent suitor. Besides this, Rankin, in answer to the question

first put to him on this subject, answered positively that he had never had such connection; and this answer, though contradicted, is not explained. And the spirit of Mephistophelian mockery at religion, manifested at the beginning of his testimony, by stating, at the time of his first acquaintance with the defendant, "the year when *Brother Hammond*, the revival preacher, was here;" unchecked by any shame for the exposure of himself, or remorse for the betrayal of her, on the disclosure he was about to make, does not, in my view, add to his credibility. I must regard the evidence as balanced on this point, and that the complainant, who has the burden of proof, has failed to show any ante-nuptial unchastity, except with himself. If fully proved, it would be no foundation for a divorce; it would not be admissible to support the proof of subsequent adultery, or even to make the evidence more credible, any more than upon the trial of an indictment, proof of a former crime would be admitted to support the offence then charged. But if it had been proved, and it had also been shown that it was the cause of the desertion, it would have tended to palliate the conduct of the complainant in that respect.

The allegation that the marriage took place under compulsion, and the threats of the defendant's father, is not only not proved, but is shown to be utterly unfounded and false.

The next question is as to the fact of adultery, by the defendant, with James M. Clark, charged in the bill as the foundation of the relief sought. The complainant, at or somewhere about the time when he abandoned his wife, had attempted to procure other men to commit adultery with her, to lay the foundation for a divorce. This is shown by three separate witnesses on part of the defendant—witnesses whose characters are unimpeached, and who are not contradicted in the substance of their testimony, or circumstances detailed, not even by the complainant himself, who necessarily knew the truth or falsity of this evidence. On each of these occasions he offered liberal rewards, in case of success. On one occasion he took his wife to New York, met the proposed

adulterer, as if by accident, in the train, and left her with him on the corner of Broadway, under a feigned pretence. The hired adulterer did not succeed, so far as appears, further than to induce the defendant to enter a restaurant with him, and partake of refreshments. At another of these attempts, he concocted with his agent a scheme to drive his wife in a sleigh to Elizabeth, and then go by rail to Philadelphia, where the matter was to be accomplished. He advanced money for the trip, and went with the agent to get the sleigh. This scheme was again unsuccessful, but whether these failed from the virtue of the defendant, or the want of skill or the repugnance of the agent, does not appear.

The time of these several attempts is not shown, but I think it can be gathered, from the whole of the evidence together, that it was somewhere in the winter of 1865. These failing, the complainant, some time in 1865, removed to Indiana, and in January, 1867, commenced proceedings for a divorce in Indiana, which he obtained in March, 1867. In that year, after his return to Newark, the proceedings of the municipal authorities, above mentioned, to compel him to support his wife and child, which are still in progress, were begun. Complainant and his father, under the name of Hedden and Son, were manufacturers of photographic plates, which they had for some time furnished to James M. Clark, who was a photographer, and had his rooms at 299 Broad street, Newark. Clark was a single man, twenty-seven years old. In 1868 he had, as a partner in that business, Joseph A. Logan. The complainant was an intimate friend of Clark, but not, as Clark testifies, the most intimate friend that he had; he called at the rooms of Clark sometimes on business, frequently on other occasions, and was there several times a week.

Some time in March, 1868, the defendant went to these rooms in company with a female friend. She was not known either to Clark or Logan, nor does it appear, except by the defendant's testimony, for what purpose she went; she says, to have her picture taken; Clark or Logan do not recollect.

She went afterwards to the gallery, the next time with the same friend, on like business. She introduced herself to Clark as George W. Hedden's wife. Clark, who did not know that Hedden had a wife, inquired of Logan, who informed him that he had. She continued going there at intervals, from March until and in September, 1868. She was there more than a dozen times in all. She went once with her mother, once with her sister, and once with her child; the child's photograph was taken, but not paid for; Clark kept a copy and presented it to the complainant, because, as he says, he was the father of the child. Defendant went to these rooms also alone. She sometimes stayed there with Clark after business hours, and alone with Clark, but never after seven o'clock. Clark's bed-room, after April, 1868, was on the same floor with the gallery, in the rear, and the door opened in the gallery. The defendant came there one morning at eight or half past eight o'clock, anxious, for some purpose, to see Clark, and told the office boy, who said that he was in bed, that she wished Clark would hurry up. She afterwards went into his bed-room, sat on the side of his bed, and asked him for $4, which he gave her. She was there fifteen or twenty minutes, and the door was closed. She met Clark twice, by appointment, in these rooms, after business hours and alone. Clark would kiss her, sit with her on his lap, or with his arms around her, or holding her hand in his, in presence of the attendants in the office, and he raised her dress there to show her foot. On one occasion he directly asked for a favor in presence of Logan, to which she replied that he had already had too many; that she was in trouble by him. She told Logan that she was in trouble by Clark, and that she had been to Dr. Smith, who had relieved her. On another occasion, after business hours, when she was standing or walking with Clark there, and Logan and three others were standing at a table throwing dice, Clark proposed to them, in coarse language, to throw for which of them should enjoy Mrs. Hedden. She replied, "no you won't," but manifested no further indignation or resent-

ment. Clark testifies that he did, when alone with her there, take off articles of her clothing, besides her hat and shawl; but what article he is unable to say, except that it was not her dress; perhaps he had forgotten. On one such occasion she was on his bed, and he also was upon it. He says that she made him believe that she was pregnant by him, and that he, at her request, paid Dr. Smith, whom she had consulted in the matter. But Clark does not testify directly that he had intercourse with her. When asked, he declined to answer that question, although he willingly answers a series of questions evidently aimed at proving the adultery, by proving facts and circumstances from which it may be inferred, and as to which his admissions are just as potent to convict him of the adultery as to condemn her. His refusal to answer the direct question, under such circumstances, cannot be taken to be for the purpose of saving himself, or protecting the defendant; it is a mere pretence, a toying with truth, an attempt to place himself in a position to which he is not entitled. Neither he nor any other witness has directly proved the adultery. The facts and circumstances proved are sufficient, abundantly sufficient in a cause differently situated, to convince any one of her adultery with Clark. In this case, the suspicion naturally arises that Hedden, who had repeatedly endeavored to induce others actually to commit the adultery, might have procured Clark to permit and tempt the defendant to be there under circumstances that would condemn her. This might account for some of these circumstances, but will not account for all. Her reply to him, in Logan's presence, that she was in trouble through him, and her statement to Logan that she had been in trouble by Clark, and that Dr. Smith had relieved her from it, will admit of no construction consistent with her innocence. The whole evidence forces upon me the conclusion beyond any reasonable doubt that the defendant was, some time between April and October, 1868, guilty of adultery with Clark at his rooms at 299 Broad street, in Newark. This is the offence charged in the bill with suffi-

cient precision to entitle the complainant to the benefit of this proof. It is worthy of remark that, although these acts of adultery were within a few months before the filing of the bill, and the witnesses were examined within a year afterwards, yet no time is specified as to any of the interviews in which adultery might be inferred. Clark says that his bed-room was at the gallery after April, and Van Houten, who was present at her going to his bed-room in the morning, and at the dice scene, went there in July, 1868; these are the only guides.

Two other questions arise from the facts in this cause, both of grave importance and not free from difficulty. The first is, whether the complainant is not guilty of conniving at, and consenting to, the adultery of his wife in such way as to forfeit his title to a divorce; secondly: as he had, for more than three years before both the filing of the bill and the commission of the adultery proved, willfully and obstinately deserted the defendant in such manner that the obligation of the marriage contract was, by the law of the state, absolved as to her, and she entitled to a decree of divorce, whether he has any right to complain of adultery on her part, or to relief for the breach of contract which he had never performed on his part, and which was thus, by law, forfeited previous to her default.

The statute provides that if the adultery is by collusion, with intent to procure a divorce, or if the complainant is *consenting* thereto, no divorce shall be granted. This is an adoption and a re-enacting of the rules on this subject, adopted and applied by the ecclesiastical courts in England, in matters of divorce *a mensa et thoro*, of which they had jurisdiction, and the practice and decisions of these courts have, so far as applicable, been adopted and followed in this state in divorce causes. By these decisions, it is settled that a husband who connives at, or assents to, adultery by his wife with one person, shall be deemed as assenting to it with others, and will not be entitled to a divorce for a subsequent act of adultery with a different person. This doc-

trine is both reasonable and well established. The only authority to the contrary is the judgment of Sir William Wynne, in the case of *Hodges* v. *Hodges*, 3 *Hagg.* 118. But that is a peculiar case, and the judgment is based upon the fact that the defendant was living with the subsequent adulterer and having children, which were baptised in the complainant's name, and who, she claimed, would be his heirs, as born within the bond of matrimony. And the judgment does not reject the rule, but avoids its application. The doctrine was sanctioned and approved by Sir William Scott (afterwards Lord Stowell) when Dean of the Arches, in *Timmings* v. *Timmings*, 3 *Hagg.* 76, and *Lovering* v. *Lovering, Ibid.* 85. And in the trial of the civil suit of *Hodges* v. *Windham*, which arose out of *Hodges* v. *Hodges*, Lord Kenyon charged, "that the husband, having suffered such connection with other men, was equally a bar to the action, as if he had permitted the present defendant to be connected with her." *Peake* 316. Dr. Lushington, in *Stone* v. *Stone*, 1 *Robertson* 99, alludes to the case of *Hodges* v. *Hodges*, and repudiates the doctrine "that the husband may connive at the adultery of his wife with one man, and at a subsequent period obtain a divorce in these courts for her adultery with another." These authorities say it is true that connivance in a prior case will not affect the complainant unless the adultery was committed. But this only applies to cases of mere connivance; these are when the husband, without positive acts, permits or suffers, without interference, conduct or acts which ought to convince him of the guilt of his wife. It has never been applied to a case where the husband actually attempted to procure the adultery to be committed. It ought not to be applied to such case. In the other class of cases, the result showed that the husband's confidence in his wife was, at the time, well founded, and his negligence not criminal. This reasoning cannot apply to a husband who has four times attempted, by large rewards, to induce others to commit adultery with his wife. He has entirely abandoned all right to claim that his

wife should be chaste; he has thus consented to her adultery with others besides the three he tried to persuade to it, and *volenti non fit injuria.*

But if this were not the rule, and if this court was governed by the doctrine imputed to Sir William Wynne in *Hodges* v. *Hodges*, that consent or connivance with adultery with one person, did not take away the right of divorce for a subsequent adultery with another; yet there is in this case evidence to show that the complainant knew of and acquiesced in these acts of adultery with Clark, even if he did not procure them to be committed.

He was a frequent visitor at this gallery, several times, weekly; he was an intimate friend of Clark; after one of the earlier visits, Clark gave him a photograph of his child. He heard from time to time what occurred there relative to his wife. And although Clark says he did not tell him the whole, yet he states that he could learn it from the others, who knew all. When the defendant first met Clark she told him of all her troubles with her husband. It is impossible to believe that Clark kept this story from his friend and associate, who, as he must have known, hated his wife, and would be glad to see her degraded. It is possible to suppose that the husband may have continued his visit to that gallery without meeting his wife, but it is impossible to believe that he continued to visit there without hearing of her visits, and the scenes that occurred. Clark testifies that the complainant was in the habit of visiting him at his gallery for various purposes; that he was at one time apt to run in for a few minutes every time he came down town, sometimes on business, and at others without business, other than sociability. He testifies that he did not tell the complainant what he testified to in the cause, but that complainant had mentioned it to him, though not all the facts he has sworn to; but he states that the facts were known to Van Houten, to Moffat, and Logan; some of these had seen familiarities; he had told to Logan what he had not seen. I do not think any one can doubt from the evidence, but all

these men knew every thing done by or with Mrs. Hedden, as it occurred. Logan was told all. And the character of these men, of Clark, and of the place that he kept, leads irresistibly to the conclusion that what was known to Logan was known to all. Some of the witnesses show that she tried to keep out of Clark's way, when he attempted to touch her or use familiarities with her; that she would say "oh don't;" the natural inference was that this was at his first attempts, for no one would suppose that after the dice scene, or the solicitation scene, that she could feel or would affect, in presence of these men, any coyness. The whole history from her entering these rooms until her degradation to the depth she was made to submit to, was known to all. From the demoralized character of the complainant as shown in the case, from his feelings towards the defendant, his anxiety to procure her to be debauched, and from the character of the men whom he met at this gallery as his friends, Clark, Logan, and Moffat, I cannot believe that he was visiting there almost daily while this intrigue with his wife was going on, without knowing it, and that in its details. It is possible to believe Clark when he says that he did not tell them to the complainant, because it is possible and not difficult to believe that Clark set about accomplishing, as a friend of complainant, what he had failed to procure to be done for money, and was aware that it was best that complainant should not know it from him. The positive evidence which is in the case, that he knew these transactions, *may* be so construed as to mean knowledge after the completion of the matter, and there are no words to fasten this knowledge to that time; but the inference unavoidably to be drawn from the facts is, that it must have been communicated as the matter progressed. The proof is circumstantial, but so is the proof of the defendant's adultery, and I have as little doubt of the complainant's knowledge of this matter at the time, as I have of the defendant's adultery. The solicitation scene in Logan's presence, and the dice scene in presence of the four, Logan, the two Moffats, and Van Houten, while

they show, what they were proven to show, the degradation of the defendant and her utter subjection to Clark, seem to indicate a purpose on part of Clark to have proof by others than himself, to give effect to his evidence of circumstances, if he should find it best to decline answering directly as to the act of adultery. I cannot conceive how, without some such object, unless sunk much lower in profligacy and brutality than I have any right to infer of Clark, he could thus gratuitously degrade any woman that he was willing to enjoy, by offering her person to four of his comrades on the throw of dice, or even by soliciting for himself in the presence of any one. But I do not put the case on the ground that the complainant employed Clark to commit the adultery; the proof, although it may excite suspicion, is not sufficient for that purpose. But it is sufficient to show that he knew of the visits of his wife to this establishment, and of the character and intentions of Clark. If he knew this, his standing by without interfering, and permitting it to go on, is sufficient acquiescence and connivance to deprive him of his right to divorce. It is, in law, consent.

It is laid down that if a husband sees what a reasonable man could not see without alarm, or if he knows that his wife has been guilty of ante-nuptial incontinence, or if he has himself seduced her before marriage, whereby he is put upon his guard respecting her weakness, he is called upon to exercise a peculiar vigilance and care over her, and if he sees what a reasonable man could not permit, and makes no effort to avert the danger, he must be supposed to see and mean the result. *Bishop on Marr. and Div.*, § 344; *Poynton on Marr. and Div.* 227–230; *Dillon* v. *Dillon*, 3 *Curteis* 86; *Moorsom* v. *Moorsom*, 3 *Hagg.* 87.

In this case the complainant, if guilty of connivance at all, must be held guilty with intent that his wife should be lead to commit adultery. It is not a case that can excuse his inaction by overweening confidence, or want of discernment, or his unsuspicious nature. Nor was he discharged from the vigilance required, by his having deserted her, and

all his marital duties for three years, or by his having obtained a divorce in another state. If the marriage relation existed in this state so that he can complain of a violation of its obligations, he was not discharged from the obligations imposed by it, to watch over and protect the virtue of his wife and not to permit her to be debauched, when caution on his part would prevent it. The maxim *volenti non fit injuria*, applies with peculiar force to such a case.

The contents of the record of divorce exhibit the complainant in such a light as to strengthen and justify the conclusions arrived at as to his intentional connivance, so far as founded upon his disregard to truth and principle. The petition states as the ground of divorce, that at the marriage he believed the defendant to be virtuous, and that she had never had carnal connections with *any person*, but that on the same evening he discovered that she was pregnant, and for that reason he has never lived with her, or had sexual intercourse with her. This is the only reason for divorce contained in the petition. The decree adjudges that upon the proof, " the matters and things set forth in the petition, are true as therein alleged." The fact that he had antenuptial intercourse with his wife is admitted in the bill in this case, and must be taken as true for all purposes, and the fact of cohabiting with his wife for months after marriage, is proved beyond question. This shows that the divorce was procured on pretences known by him to be false, and proved by perjury or subornation of perjury, on his part. The bill in this case deliberately misrepresents that decree as founded upon adultery. And some such misrepresentation was necessary to make the allegations in the bill consistent with themselves.

I am therefore of opinion that the statutory bar of consent to the adultery, is proved in two ways. First, by the consent to adultery with three other persons whom he employed to commit the crime with her, which in the case of such actual employment, I hold to be a sufficient consent to subsequent adultery with others, although the adultery he

devised was not committed. Secondly, by the proof from circumstances, of his knowledge of and connivance at her intercourse with Clark, in such manner as to show intentional consent on his part to that adultery.

This debars the complainant of the relief sought, and renders it unnecessary to consider the question, whether the desertion for three years, under circumstances which entitled the defendant to a divorce before the commencement of this suit, and before any adultery proved, would bar the complainant. The courts of some states, with statutes like our own, have held this a sufficient bar. The reasoning of those cases would apply with increased force to this case, where the complainant has, by a divorce, beyond question valid in the state of Indiana, so far actually severed the marriage tie, that when there, he is free from all duties to his wife, could contract another valid marriage, and could live with such other wife without adultery, and, if the law of that state is like that of New Jersey, would be guilty of adultery by even living in the same house with the defendant.