FREDERICK W. CANE

v.

CATHARINE A. CANE.

1. A visit by a married woman to a brothel, will, unless satisfactorily explained, justify the presumption that she went there for a criminal purpose.

2. Such conduct will not, however, afford evidence of guilt if it is shown that the wife was decoyed there, by the procurement of her husband, and for the purpose of making a case against her.

3. A husband who seduces his wife before marriage, and, after marriage, sees her in a situation of temptation and does nothing to rescue her, and she yields, will be understood as having consented to her adultery.

On final hearing on petition and answer and proofs taken in open court.

*Mr. John Linn*, for husband.

*Mr. Gilbert Collins*, for wife.

VAN FLEET, V. C.

These parties are before the court in cross-suits. Each seeks a divorce from the other on the ground of adultery. They were married in June, 1867. For some time prior to their marriage they lived together as husband and wife, falsely representing to their parents that they had been married. A child was born to them out of wedlock. After their marriage, the husband took his wife and their child to the home of his parents in Jersey City, where they continued to live, as part of his father's family, until June, 1880, when the husband rented a house at Rutherford, and removed his wife and their five children to it. He did not go there to live himself, but remained in Jersey City, visiting his family at Rutherford irregularly, sometimes once a week, and at others at longer intervals, and for some months immediately before the commencement of his suit he ceased his visits

Cane v. Cane.

·altogether.    Prior to June, 1880, the husband says he suspected
the fidelity of his wife; the conviction of her guilt, he says, had
forced itself upon him to such an extent that his life had become
a burden to him, but he admits that the evidence which con-
vinced him was not such as would have convinced a court of
justice, and he therefore put a watch upon his wife, to see if
sufficient evidence could not be discovered to convict her of
·adultery.    The evidence against the wife comes entirely from the
mouths of those spies whom he employed, for money, to obtain
evidence to convict her of adultery.

There can be no doubt whatever that one of the husband's
·objects in removing his family to Rutherford was to place his
wife in a situation where she might be constantly exposed to the
most vigilant espionage.    But this was not his only object.    The
evidence leaves no doubt on my mind that he wanted his wife to
commit some offence against her conjugal duty, which would
·enable him to get rid of her, and that if her evil propensities
would not lead her into actual crime, he was willing that she
should be lured into such a course of conduct as would warrant
the legal presumption that she had committed adultery.    The
·case made against the wife is of the latter sort.    There is no proof
·of actual guilt, but the proof against her consists entirely of

Note.—That a married woman goes to a brothel, is *prima facie* evidence
·of adultery, *Best* v. *Best, 1 Add. 411; Kenrick* v. *Kenrick, 4 Hagg. 137;
Woods* v. *Woods, 4 Hagg, 138, note;* but may be explained, *Betts* v. *Betts,
1 Johns. Ch. 197;* and so as to going to a hotel, *Pond* v. *Pond, 132 Mass.
219;* so, where a married man enters such a house in the evening, and
remains all night, *Evans* v. *Evans, 41 Cal. 103; Van Epps* v. *Van Epps, 6
Barb. 320, 322; Langstaff* v. *Langstaff, Wright 148;* or is proved to have been
shut up in a room alone with an unchaste woman, *Daily* v. *Daily, 64 Ill. 329;*
see *Lockyer* v. *Lockyer, 1 Edm. S. C. 107; Hunn* v. *Hunn, 1 T. & C. (N. Y.)
499; Richardson* v. *Richardson, 4 Port. 467;* but his conduct, in going to a
brothel, may be explained, *Platt* v. *Platt, 5 Daly 295; Latham* v. *Latham, 30
Gratt. 307;* as to explanations of a married man's associating with prostitutes
for benevolent purposes, see, *Ciocci* v. *Ciocci, 26 Eng. L. & Eq. 604.*

As to a husband's conduct, encouraging his wife to commit adultery, in order
that he may obtain a divorce therefor, see *Timmings* v. *Timmings, 3 Hagg. 76;
Pierce* v. *Pierce, 3 Pick. 299; Cochran* v. *Cochran, 35 Iowa 477;* see, further,
*14 Cent. L. J. 162.*—Rep.

proximate acts or conduct.    But the case thus made, if it can be
believed that her conduct was not the result of procurement, but
was the natural expression of her depraved affections, is suffi-
cient to justify a decree of divorce.

Before proceeding to consider the evidence against the wife, it
should be stated that she is charged with having committed
adultery with eight different men between February 10th, 1881,
and October 9th, 1882.    Six of the eight are described as un-
known.    Nine different spies or detectives have, at different
times, during a period of two and a half or three years prior to
the institution of this suit, been employed to watch her, to see if
evidence of guilt could not be obtained against her.    Her life,
almost constantly during that period, has been subject to a close
surveillance, by persons naturally eager to discover what they
were hired to find.    The period covered by the espionage, as
well as the number and character of the persons employed to
make it, shows a persistency on the part of the husband which
evinces either that he was firmly persuaded of his wife's guilt,
or that he had made a desperate resolve that a case should be
made against her, though she was pure and guiltless.    His efforts
to discover evidence of guilt were of a character which should
excite the most jealous vigilance of the court.    A person em-
ployed for money to discover evidence to establish any fact, is
naturally eager to attain his object, and whether such be the
arrangement in fact or not, he is very likely to believe, especially
in a case like this, where his employer has the deepest interest in
his success, that his reward will to a very large extent depend
upon the success of his efforts ; while evidence emanating from
such a source cannot be rejected as unworthy of credit, it is mani-
fest, that the security of the citizen, and the safe administration
of justice, both demand that the court should examine it with
the utmost caution, and never act upon it until it has been tried
by the most vigorous tests.

The only proof against the wife which lays the slightest
foundation for a judgment of divorce, is that which shows that
she visited two different brothels, and made two visits to a bed-
house, or a place kept for illicit sexual intercourse.    There is no

Cane *v.* Cane.

other evidence in the case which warrants even a suspicion that she has been unfaithful to her husband. It is proved, however, that on the afternoon of July 8th, 1882, she was seen, in company with another woman, to enter a house of ill-fame in East Twelfth street, New York city, and also that she was seen, on the afternoon of August 20th, 1882, to enter a brothel on East Twenty-third street, in company with the same woman and an unknown man; and also, that on the afternoon of August 3d, 1882, and again, on the 17th of the same month, she was seen in company with the same woman, and two unknown men, to enter the West End Hotel, on Eighth avenue, in the city of New York. The last place, it is proved, is used as a bed-house as well as a hotel. Unless Mrs. Cane's visits to these places have been satisfactorily explained, there can be no doubt about what effect they must have against her as evidence of guilt. If she went to them fully understanding their character, and with full knowledge of the purposes for which they were used, attended by a man not her husband, it would require very strong evidence to convince any man at all familiar with human conduct that her visits were not made for a criminal purpose. Lord Stowell said, in *Williams* v. *Williams, 4 Eng. Ec. 416 (1 Hagg. Con. 299)*, that it was almost impossible to believe that a woman would go to a brothel for any but a criminal purpose; and, therefore, in his opinion, it had been properly held that such conduct on the part of a wife furnished sufficient evidence of adultery to justify a decree that she was guilty. And Dr. Lushington, in *Astley* v. *Astley, 3 Eng. Ec. 303 (1 Hagg. Con. 714)*, held that such conduct on the part of a wife must constrain a court to conclude that she had committed adultery. Undoubtedly, such conduct is always open to explanation, and if the wife can show that her visits were for an innocent purpose, or the result of accident, they will then, of course, furnish no evidence of guilt; and so, too, if it should be shown that the wife was decoyed to them, through the procurement of the husband, then, instead of furnishing evidence of guilt against her, they would show that the husband was trying to deceive the court, and to induce it, by false appearances, to pronounce an unjust judgment.

Cane *v.* Cane.

The important question of the case then is, Have these visits been satisfactorily· explained, so as to show that they do not justify the presumption of guilt? It will be remembered that Mrs. Cane made none of them alone, and that all of them were made in the light of day. She was always accompanied by one or more persons. On the first she was accompanied by a woman, on the second by the same woman and an unknown man, and on the last two by the same woman and two unknown men. Neither of those persons has been called as a witness. The husband has made no effort whatever to get their testimony. He has intentionally refrained from effort in that direction. The wife, on the contrary, has made the most strenuous efforts her means would enable her to make, to find the woman, but without success. The only evidence before the court, showing the circumstances under which the visits were made, and what occurred while Mrs. Cane was within the walls of either house, comes from her mouth alone. Her evidence on these points is full to exhaustion. She was searchingly cross-examined;. her answers were full and frank; she evaded nothing and withheld nothing, but exposed everything, without the least reserve, just as it rested in her memory. If her evidence is true, she is not only guiltless, but the victim of a most wicked and perfidious conspiracy.·

Among the spies employed by Mr. Cane to watch .his wife, was one named Edward Scott. Mr. Cane says he made Scott's acquaintance at the office of his counsel, in February, 1882, and after that, from March until the following August or September, he was constantly in Mr. Cane's employ. Scott took up his residence in Rutherford about the 1st of May, 1882, under the name of Edward Williams. He pretended to be a broker, engaged in business in New York city. When he appeared at Rutherford, he was accompanied by a woman whom he represented to be his wife. They pretended that they had been married shortly before. The woman was not his wife. He had a wife living in the city of New York, whom he had deserted, together with his infant child. Soon after Scott and this woman appeared at Rutherford, they commenced attending the church

Cane v. Cane.

of which Mrs. Cane was a member. They made her acquaint-
ance, and very shortly thereafter they asked her to take them as
boarders. She consented to do so, and they became members of
her family the latter part of June, 1882. The woman, by her
kindness, soon won Mrs. Cane's confidence. She employed Mrs.
Cane to do needle-work for her, and took her to New York
when she went shopping, and it was while they were in the city
on shopping excursions that Mrs. Cane was inveigled into these
disreputable places, her visits to which, it is now insisted, furnish
evidence of guilt. · The means by which she was lured into these
places need not be described. It is enough to say that she
swears that she did not know or suspect that they were immoral
places, but, on the contrary, believed that they were perfectly
reputable places, where she might go without the least danger to
her reputation; and that she went to each with the pretended
Mrs. Williams, at Mrs. Williams's request, and for what she
believed, at the time, was a real, as well as a perfectly innocent
purpose. She further swears that Mrs. Williams represented to
her that the men who accompanied them were either relatives
of hers, or very warm friends of her husband, and that not only
is she guiltless of any criminal conduct with either of these men,
but that at no time while they were in her presence was there
anything in the conduct of either which led her to doubt, for
one moment, their decency or respectability.

The truth of these statements stands not only uncontradicted,
but I think that it receives strong confirmation from Mr. Cane's
own conduct. Scott was his agent. He says he employed Scott
to watch his wife, to see where she went, and to find out what
she did, but that he did not employ the woman, and did not
know her. But he admits that he saw Scott two or three times
in July, and about the same number of times in August. These
were the months, it will be remembered, in which the visits were
made, the first being made on the 8th of July, and the last on
the 20th of August. He further admits that he knew in ad-
vance, from information furnished by Scott, when each visit
was to be made, and to what particular place his wife would go.
His information respecting the movements of his wife, was so

precise that he could tell his employer, while they were both in Jersey City, just what house in New York his wife would enter. He was in New York on the 8th of July, in company with two of his employees, and saw Mrs. Cane, accompanied by another female, enter a brothel on Twelfth street. He watched that particular house at that time, because Scott had told him that his wife would go there. Scott was not there. He was never present when Mrs. Cane entered any of these places. Although he was employed to watch her, and see where she went, and to find out what she did, and although he knew long enough in advance where she was going, to have time to notify Mr. Cane, so that he or his employee could be present when she arrived, yet he was always absent himself. Why was he absent? Why did Mr. Cane allow him to be absent? If Mr. Cane simply wanted to know the truth, if he was conscientiously trying to find out whether or not his wife was pure, but did not want a case forged against her, his natural course, as it seems to me, would have been, when Scott informed him that his wife would visit a certain brothel, on a particular day, for him not only to have required Scott to be present where he could see the visit made, but to have required Scott to disclose to him the sources of his information. Scott, it will be remembered, had foretold each visit, just when and where it would be made. Where and how did Scott get his information? Did not Mr. Cane want to know? His suspicions had made his life a burden to him. He is now told that his wife is about to furnish, by her own conduct, strong evidence of the truth of his suspicions. Such information would naturally deeply interest him; it could not fail to excite his curiosity, and make him intensely eager to know all that his informant knew. Assignations for adulterous purposes are always secret. Did it not strike Mr. Cane as startlingly strange that Scott should know, in advance, to just what brothel Mrs. Cane was going? Yet he made no inquiry. It would appear that he had no curiosity; he was indifferent and unconcerned in a situation where most other men would have been subject to a greedy and prying curiosity. This conduct is so unnatural, so contrary to the way the great mass of mankind

would act, in like circumstances, that it can be understood in but one way. He sought no further information, because he already knew all he desired to. If he knew that Scott was trying to entice Mrs. Cane into crime, or attempting to lure her into a course of conduct which would justify the presumption of guilt, he would naturally be incurious, for then the less he knew about the means that Scott used to effect his purpose, the better would be his chances of accomplishing his ultimate object. Now, it is proper to say, in this connection, that Mr. Cane says he did, on one occasion, seek information of Scott. He says the first time he saw Scott in July, Scott told him that he had hopes that he would be able to catch his wife, but that he did not state the grounds of his hopes; that he asked him why he thought he would be able to catch her, and that Scott replied: "You must trust me; I want to undertake to do what I undertake myself; and you will find I will do right by you." But there his curiosity ended. Subsequently, when Scott told him his wife would visit a certain brothel on a particular day, though the information was of the kind he had been searching for eagerly, but unsuccessfully, for nearly two years, and though the information was of a character which, if true, furnished him just ground to hope that he would soon be able to break a bond which made his life wretched and miserable, still it was not sufficient to provoke his curiosity. He does not appear to have desired to know to whose embraces his wife intended to surrender herself, nor whether she was going to the brothel for the purpose of prostitution, or was to be decoyed there by a stratagem of Scott's.

It is barely possible that a man of an extremely distrustful nature, or morbidly jealous, who suspects the purity of his wife, might, when first informed that evidence of his wife's guilt can be obtained, act with great rashness; he might not, in his eagerness to confirm his suspicions, stop to consider, or even to think, but after he believes his object is gained, and that he has sufficient evidence to establish her guilt, he will then naturally become considerate and inquisitive, and if he is told subsequently further proofs can be obtained, he will be very likely to treat

Cane v. Cane.

.such information very much as he regards the virtue of his wife—
.a thing not to be believed in, unless no reason, real or fancied,
can be found to doubt it.   Mr. Cane did not act in this way.
He never seems to have been curious or suspicious about any-
thing but the virtue of his wife, though it must have been mani-
fest to him that Scott was either decoying his wife into a course
of conduct which, though she was innocent, would make her
.appear to be guilty, or that Scott possessed some occult means
of discovering secrets.

There is another part of Mr. Cane's conduct which, I think,
furnishes very strong evidence that he knew that Scott was try-
ing either to lead his wife into guilt or to surround her with the
appearances of guilt.   He knew, as already stated, that his wife,
.on each occasion when he says she was guilty of conduct indicat-
ing a criminal intent, was accompanied by another woman.   He
saw them enter the brothel together at the time of their first
visit.   He knew the other woman by sight, and also that she
lived at Rutherford.   So he told his spy, William Schenck.   He
says, it is true, that he did not find out until August or Septem-
ber, 1882, that Scott was boarding at Mrs. Cane's house, but he
.admits that he was then told that there was a woman there with
Scott.   But it is impossible to believe that he is not mistaken as
to the time when he was first told that Scott and this woman had
become members of his wife's family.   For a year prior to the
time they went there, his wife and her household had been con-
stantly subject to the most vigilant watch, and it cannot be
believed that two persons, one of whom was a man, could have
been added to his wife's family without that fact coming to his
knowledge at an earlier time than he states.   It is highly proba-
ble, in view of all the circumstances, that they had not been
there a week before he knew it, and I think it may well be
doubted whether he did not know they were going there before
they went.   But suppose we assume it to be true that he did not
hear until he says he did, that they were members of his wife's
family, it is undisputed that he knew on the 8th of July, and
.also on the occasion of each subsequent visit, that his wife did
not go alone to these immoral places, as she would most probably

have done if her purpose had been criminal, but was always accompanied by another woman, whom he knew by sight, and also where she resided. Where and how did he get his knowledge of her identity, and of the place of her residence? And when he learned this much respecting her, did he stop? Did he prosecute his investigations no further? If his wife was criminal, this woman was her associate in crime. Any evidence affecting the one would have equal force against the other. He knew where this woman lived; it was easy, therefore, for him to have found out who and what she was, what roof sheltered her, and whose wife she claimed to be. A very slight investigation—a simple visit to his wife and children—would have furnished him with full information that Scott had an associate in his undertaking. It must be remembered that he was desperately eager to procure evidence against his wife. His conviction that she had dishonored his bed was so strong as to embitter his life. Now, with such clues to guide him in his search, it is impossible to believe that he did not follow them to their uttermost extent, unless it is also believed that he had been forewarned that his case was one in which it might be dangerous for him to know too much, or to be too zealous or too inquisitive.

But the most decisive evidence furnished by Mr. Cane's conduct remains to be considered. He discharged Scott in August, 1882. He says that he does not know that he expected to see Scott again. Scott was going to Boston. He says he said to Scott, when they parted, that he might have no occasion to see him again, and that Scott told him if he did he should write to him at the Parker or Palmer House, Boston. He has never written to him. He says two or three months before he was examined as a witness in this case, he looked for Scott in New York, but the manner in which he says he conducted his search, as well as his whole conduct towards this man Scott, shows conclusively that he did not want him as a witness. And yet Scott, if his case was an honest one, was unquestionably his most valuable and important witness. The same means by which Scott learned when the visits were to be made, undoubtedly also informed him with whom and for what purpose they were to be made. Mr.

Cane was struggling to free himself from a bond which made his life a burden to him. In such a contest he was not likely to lose sight of any of his advantages, nor to cast aside his most trusty and efficient weapon. It is impossible to believe that either Mr. Cane or his counsel did not see and appreciate the importance and value of Scott's evidence. But no effort was made either to secure him as a witness or to procure his evidence subsequently. As the proofs now stand, it is shown that every circumstance indicating guilt surrounding Mrs. Cane was the work of Scott. Can it be doubted that the reason that Mr. Cane did not want Scott as a witness was because he knew too much? But more, if Mrs. Cane visited these places for a criminal purpose, it was easy for Mr. Cane to prove it. The woman who accompanied her on each occasion was Scott's accomplice, and knew just how Mrs. Cane was induced to go to these places. Mr. Cane has made no effort to obtain the testimony of this woman. The reason is obvious.

The case against the wife utterly fails. If it were stronger, indeed if guilt was shown, still I think it would be the duty of the court to deny the prayer of the husband in view of his conduct. A husband who seduced his wife before marriage, and thus makes himself acquainted with her weakness, and, what is more, responsible for the loss of that strength of character which conscious purity always gives a woman, places himself in a position where the law, in consequence of his wrong, requires him to shield his wife with peculiar vigilance, and to see to it that she is not exposed to temptations that he knows she cannot withstand. If such a husband sees his wife in danger, if he sees her in a position where she is likely to become subject to the power of the blandishments of a man whose character he knows to be bad and intentions evil, and he does nothing to warn her, or to withdraw her from his influence, but allows her to be led on to her ruin and his dishonor, his conduct, in law, amounts to consent, and the statute declares that no divorce for adultery shall be decreed when it appears that the party complaining consented thereto. Chancellor Zabriskie declared in *Hedden* v. *Hedden, 6 C. E. Gr. 61,* that if a husband sees what a reasonable man

Cane *v.* Cane.

could not see without alarm, or if he knows that his wife has been guilty of ante-nuptial incontinence, or if he has himself seduced her before marriage, whereby he is put upon his guard respecting her weakness, he is called upon to exercise peculiar vigilance and care over her, and if he sees what a reasonable man could not permit, and makes no effort to avert the danger, he must be supposed to see and mean the result.

The petition of the husband must be dismissed, with costs. An additional counsel fee will be allowed. The defence has been attended with unusual labor and difficulty. This has been so in consequence of the artful manner in which circumstances indicating guilt have been thrown around the wife. $150 has already been allowed; $500 is, under the circumstances, a very moderate allowance. An additional allowance of $350 will be made.

In the suit by the wife against her husband, though several adulterous acts are charged, but one is proved. That is proved by a single witness, and if it was committed at all, was committed in the summer of 1869, more that fifteen years ago. The proof in support of the charge is very unsatisfactory. The witness who swears to the act admits that when inquiry was first made of him, he did not recollect the fact; that it had entirely faded from his memory, and that it was not until he had made an effort that his recollection of the fact returned. Standing alone and uncontradicted, I think it might well be doubted whether the measure of proof thus furnished would be sufficient, in any case, to justify a judgment of divorce. The husband and his alleged *particeps criminis*, however, both deny positively that they were ever criminally intimate. In this condition of the proofs, it is clear that no divorce should be granted, and that the petition of the wife must also be dismissed.