On petition for divorce, filed by the wife, on the ground of desertion, and a counter-claim charging adultery.
At the time of the final hearing, the petitioner failed to appear, although her counsel was present and took such part as he could in opposition to the counter-claim without the presence and assistance of his client. The defendant moved his counter-claim, and the matter was heard upon that pleading.
The parties were married in December, 1922, when the defendant was twenty-six, and the petitioner was twenty. He appears to be a man of education and refinement. Unlike the usual marriages, these parties never took up their residence together, and neither one of them was held out to society as the other's spouse. He continued to reside at the home of his parents in this state, while his wife took up her abode with her mother as a single woman. While living in this state of physical separation she was discovered by her husband in a room at night with a man named Mandell, under circumstances that were ample to convince anybody that she had been guilty of adultery with him. That act was condoned, and her husband afterwards supported her by payment of a weekly stipend until the 2d day of October, 1925, when she, unquestionably, again committed adultery with a man named Proctor, in her bedroom in a New York hotel, where she was living, to the knowledge of her husband, as an unmarried woman.
This man is not entitled to any relief at the hands of this court because of his own conduct. It will have been observed that although he had gone through the marriage ceremony with this woman, he never discharged any of his obligations *Page 488 
incident to his status as her husband, except the mere, material, financial means of animal sustenance. Added to that is the further fact that he knew when he married his wife that she was a weak vessel and required unusual protection. At the close of his cross-examination he was engaged in the following conversation:
"Q. How old were you at the time you were married?
"A. Twenty-six.
"Q. How old was your wife?
"A. Twenty.
"Q. Was she then engaged in theatrical work?
"A. She had been on the stage before, and when she wasn't on the stage she was a model.
"Q. Did you know, before your marriage, of any sexual intercourse she had ever had, either with you or anyone else?
"A. Yes.
"Q. If you knew of her weakness why didn't you do something to protect her from the likelihood of her committing adultery?
"A. Well, it was rather difficult to do that without living with her, you see.
"Q. Were you willing to risk the destruction of the soul of the woman you married, rather than to face some other consequence?
"A. [The witness does not answer]."
The explanation given, either by the defendant or his counsel, to explain the former's failure to make a home for his wife was, that he had recently entered upon the export business at the time of his marriage and was still dependent upon his father for his support and perhaps the capital that was required in his vocation. His marriage had been a secret one, and he was apprehensive that if the fact became known to his parents he would be cast adrift to fend for himself. A sorrier excuse could hardly be given.
Under the circumstances of this case a husband is under a peculiar duty to protect his wife against her own weakness. The defendant knew at the time of his marriage that his wife had been unable to resist temptation and had been the victim of seduction. Not only did he fail to give her a home but he never even gave her his name. He never threw around her the protection that every husband is supposed to give his wife, however moral she may be. He did not give her the comfort of his society, as a man is supposed to do. She was *Page 489 
left, under all these circumstances, with abundant opportunity to seek the solace of the companionship of others, and the inevitable came to pass.
In Hedden v. Hedden, 21 N.J. Eq. 61, the husband had seduced his wife before marriage. He then was guilty of highly suspicious conduct pointing to, but not proving, a conspiracy to have another man carnally know his wife. Chancellor Zabriskie did not feel that this crime against him had been proved. He says (atp. 74):
"But I do not put the case on the ground that the complainant employed Clark to commit the adultery; the proof, although it may excite suspicion, is not sufficient for that purpose. But it is sufficient to show that he knew of the visits of his wife to this establishment, and of the character and intentions of Clark. If he knew this, his standing by without interfering, and permitting it to go on, is sufficient acquiescence and connivance to deprive him of his right to divorce. It is, in law, consent.
"It is laid down that if a husband sees what a reasonable man could not see without alarm, or if he knows that his wife has been guilty of antenuptial incontinence, or if he has himself seduced her before marriage, whereby he is put upon his guard respecting her weakness, he is called upon to exercise peculiar vigilence and care over her, and if he sees what a reasonable man could not permit, and makes no effort to avert the danger, he must be supposed to see and mean the result." Bish. M. D.
§ 344 Poynt. M. D. 227, 230; Dillon v. Dillon, 3 Curt. 86;Moorsom v. Moorsom, 3 Hagg. 87.
In the later case of Cane v. Cane, 39 N.J. Eq. 148,
Vice-Chancellor Van Fleet, in discussing the duty of a husband, under the circumstances of the case at bar, says (at p 158):
"If such a husband sees his wife in danger, if he sees her in a position where she is likely to become subject to the power of the blandishments of a man whose character he knows to be bad and intentions evil, and he does nothing to warn her, or to withdraw her from his influence, but allows her to be led on to her ruin and his dishonor, his conduct, in *Page 490 
law, amounts to consent, and the statute declares that no divorce for adultery shall be decreed when it appears that the party complaining consented thereto. Chancellor Zabriskie declared inHedden v. Hedden, 6 C.E. Gr. 61, that if a husband sees what a reasonable man could not see without alarm, or if he knows that his wife has been guilty of antenuptial incontinence, or if he has himself seduced her before marriage, whereby he is put upon his guard respecting her weakness, he is called upon to exercise peculiar vigilance and care over her, and if he sees what a reasonable man could not permit, and makes no effort to avert the danger, he must be supposed to see and mean the result."
In the case sub judice, as in all other similar suits, theactor comes into court to complain of a wrong perpetrated upon him, or her, with regard to the contract or status of the parties. It is elementary in our jurisprudence generally (not only in divorce suits) that in such a case the complainant, whatsoever his position may be denominated, must not himself have been guilty of any wrong or neglect of duty upon his own part with regard to the subject-matter of the proceedings. It is pointed out in 2 Bish. Mar., D. S. § 345, that in an action for damages for personal or other injury by reason of the defendant's negligence, the plaintiff, to recover, must have been free from carelessness contributing to the injury. In an actionex contractu, resting upon mutual and dependent promises, the plaintiff must have kept his promise. Nor can one enforce a contract, so called, founded upon the violation of a statute, for he himself has been guilty of a wrong in the premises. Therefore, the complaining party is left where he is found, because of his own failure to observe the law or perform his duty. It is not the meaning of this doctrine that the defendant's wrong-doing in the case at bar, in failing to give that protection to his wife that the law casts a duty upon him to give, has clothed the petitioner with any right to break the law. She is quite as liable to a criminal prosecution for her illegal act as if the conduct of her spouse was unimpeachable. Although this defendant has suffered what would otherwise have been a *Page 491 
grievous injury, he should not be heard to complain of consequences which he must be considered to have foreseen and which have fallen upon him as the result of his failure to perform his duties. His neglect of his wife renders her misconduct no less reprehensible, morally or criminally, but when he complains of his private injury, produced in large part by his failure to perform his duties to her, his complaint falls on deaf ears, so far as this court is concerned.
Thus, we have a case showing a man of maturity, education and refinement marrying a woman known by him to be susceptible to the blandishment of designing men; who compels her to live apart from him without any of the protecting influences that he was bound to provide around her; who saw her engaged in two occupations perhaps more perilous to the chastity of women than any other calling permitted by the law, and who did not offer to provide a home for her, even after he had discovered and forgiven her first matrimonial offense. It seems to me that it would be hard to find a case lying more squarely within the rule so clearly expressed in the above opinions, viz., if a husband sees what a reasonable man cannot see without alarm, knowing his wife to have exhibited her weakness by antenuptial incontinence, "he is called upon to exercise peculiar vigilance and care over her, and if he sees what a reasonable man could not permit and makes no effort to avert the danger, he must be supposed to see and mean the result."
Of course, it is not to be deduced from anything said herein that in ordinary marriages an innocent party is under any duty to interfere with an act of adultery by his or her spouse after suspicion is aroused in the former's breast but where the opportunity and desire are entirely the creation of the latter and the paramour, and the former had no reason to suspect the chastity of the latter at the time of the marriage. The former may spy and watch the movements and the actions of the other without an effort to frustrate the guilty desire. Lehman v.Lehman, 78 N.J. Eq. 316. But when a husband is put upon his guard, the peculiar duty mentioned above devolves upon him and he cannot be recreant to it and then expect the assistance of this court. *Page 492 
It so happens that in the cases quoted above the husband in each instance had seduced his wife before marriage, but a reading of the opinions clearly discloses that that was not the reason for the decision. In both cases it is made apparent that the husband takes, upon his marriage to a woman whose failing he knows, the duty already discussed, which is far beyond his obligation in the case of his marriage to a woman he believes to be pure and against whom it would be an insult to exhibit the slightest suspicion until cause had been given therefor. The language in the Hedden Case, supra, specifically is, "if he knows that his wife has been guilty of antenuptial incontinence,or if he has himself seduced her before marriage," he must exercise peculiar vigilance and care. (Italics mine.) The question of antenuptial incontinence was not present in the case of Delaney v. Delaney, 71 N.J. Eq. 246; rev. S.C., 69 N.J. Eq. 602,
or Atha v. Atha, 94 N.J. Eq. 692; affirmed in 95 N.J. Eq. 275,
although in both instances the Hedden Case and theCane Case were used as a basis for the decisions. The court went much further and simply based the decision upon that part of the rule expressed in the last-mentioned cases, which says that if a husband, under the circumstances of this case, complacently observes what a reasonable man could not see without alarm, he must be considered to realize to what it tends and to mean that the event shall occur. The husband, in the case sub judice, after two warnings of the inability of his wife to control her sexual appetite still continued, as already pointed out, to allow her to reside alone as an unmarried woman while surrounded by the enticement and the character of the men always to be met by a woman employed as she was.
It was urged upon the argument that this man's position is an impossible one. That may be so, unless he shows himself to be the man he did when he forgave her first adultery, recognizing his own shortcomings, and makes an earnest effort to carry out the solemn vow he expressed at the time the petitioner became his wife. He was not an ignorant boy at the time of his marriage. He was a fully matured man of twenty-six, sound of body and mind, who should have experienced *Page 493 
no fears of his ability to earn a livelihood for her and himself. There would be few marriages if every young man should postpone his wedding until he had amassed a fortune or established a successful business. But whether his lot be a hard one or not, the policy of our law forbids this court to give him any relief, and if such is to be had, it must be secured from that branch of the government to whom is committed the authority to declare the policy of the state. Whether relief should be given in a case like this is at least problematical, in view of the lightness with which this solemn ceremony is so frequently entered.
The petition should be dismissed for lack of any evidence, and the prayer of the counter-claim denied.