BATTERY PARK NATIONAL BANK

*v.*

WILLIAMS A. HUNT et al.

[Decided June 8th, 1914.]

1. In a creditor's suit in aid of an attachment to recover property, the title to which was in the name of the debtor's brother, evidence *held* to show that the purchase price of the property, the amount of a mortgage subject to which it was purchased, and the cost of improvements on the property, were paid with the debtor's money, though part of the payments were made by means of checks drawn on accounts standing in the brother's name, and hence the debtor, by virtue of a resulting trust, was the sole beneficial owner of the property.

2. Evidence *held* sufficient to show that an assignment of a mortgage by the debtor to his brother was with intent to hinder, delay and defraud his creditors.

*Messrs. Condict, Condict & Boardman,* for the complainant.

*Mr. William L. Rae,* for the trustee in bankruptcy.

*Messrs. Lum, Tamblyn & Colyer,* with whom was *Mr. Frederick Durgan* (of the New York bar), for the defendants Williams A. Hunt and Fred M. Hunt.

LEWIS, V. C.

This cause was brought to trial on the bill, answers and replications and cross-bill and answer to cross-bill and proofs. The original bill was filed by the Battery Park National Bank of New York, in aid of an attachment issued out of the su-

preme court of New Jersey at the suit of the complainant, against the property of Fred M. Hunt, one of the defendants.

The property described in the bill consists of a plot of land on Washington street, Newark, upon which there stood at the time of the filing of the bill three brick residences, a stable and a garage. The title to this land is in the name of Williams A. Hunt, a brother of Fred M. Hunt. The bill charges, however, that the beneficial ownership of this property is in Fred M. Hunt, and that Williams A. Hunt holds the bare legal title as trustee for Fred M. Hunt.

The property was originally purchased from Luella K. Beecher, by contract dated November 20th, 1911. The agreed purchase price was $33,000, to be paid by the assumption of a first mortgage of $15,000, and of a second mortgage (called the Katz mortgage in the testimony) of $6,500, and the payment of $11,500 in cash.

The purchase price was actually paid as follows: by the assumption of the two mortgages and the payment of three checks to the order of Beecher, on the Bankers Trust Company of New York, upon an account standing in the name of Williams A. Hunt. These checks were as follows:

| | |
|---|---:|
| November 20th, 1911 | $1,000 00 |
| November 23d, 1911 | 4,000 00 |
| December 4th, 1911 | 5,683 86 |
| Or a total of | $10,683 86 |

The defendant Hunt accounts for the discrepancy between the $11,500 cash payment called for by the contract, and the $10,683.86 actually paid, by saying it was a credit allowed the purchaser on adjustment of interest on the mortgages and the taxes.

After the filing of the bill in this cause, Fred M. Hunt, on September 13th, 1912, filed a petition of voluntary bankruptcy in the southern district of New York; George F. D. Trask was appointed trustee in bankruptcy of his estate.

The said trustee thereupon filed a petition in this cause to be made a party. His petition being granted, he filed an answer by way of cross-bill, in which he claimed that the property de-

scribed in the bill and now vested in him by operation of law as a part of the estate of his bankrupt. Fred and Williams Hunt answered the original bill and Williams Hunt answered the cross-bill.

An order was made by the United States district court of the southern district of New York, under section 67f of the Bankruptcy law, preserving the lien of the above-mentioned attachment for the benefit of the estate of the bankrupt. This order has been made a file of this court in this cause.

The trustee has filed, pursuant to the provisions of the Bankruptcy act, in the register's office of Essex county, a copy of the decree adjudicating Fred Hunt to be a bankrupt.

The complainant and trustee in bankruptcy have a common interest. The complainant makes no claim under its attachment to preference over the other creditors.

The complainant and the trustee in bankruptcy take the position that the proofs in this cause are sufficient to sustain their claim that Fred M. Hunt was the beneficial owner of the property in question upon any one of three grounds, that is to say— *first,* that the admissions of Williams Hunt, coupled with the evidence of the dominion exercised by Fred M. Hunt over the property, is sufficient to establish the existence of an *express* trust agreement between the two brothers, whereby Williams agreed to hold the property in trust for Fred, and *secondly,* that the dominion exercised by Fred M. Hunt over the bank account, out of which the original purchase price was paid, and the proved fact that Fred expended his own money in paying off a second mortgage on the property, and in erecting an expensive stable and a garage upon the property, establish a trust estate in Fred *resulting* from the payment by him of the purchase price, and *thirdly,* that if it be assumed that it was originally intended by the two brothers that Williams should be the beneficial owner, it is apparent that payments made by Fred for the property, and for improvements upon the property, were voluntary conveyances made by Fred and accepted by Williams for the purpose of hindering, delaying and defrauding the creditors of Fred, whereby a *constructive* trust or equitable lien

exists in favor of Fred's creditors. I shall consider the case as one of a resulting trust.

Williams Hunt was examined at great length before the referee in bankruptcy proceeding. A part of his examination in that matter has become a part of the testimony in this cause. His account of the payment of the purchase price was that the property was taken subject to a first mortgage of $15,000; that $1,000 was paid by the check of November 20th, 1911, and that $18,000 was paid Beecher in *cash.* "In bills," "all currency," "cash." The examiner was called to the telephone. Upon his return, it appears by Williams Hunt's testimony in the present case, that the following took place:

"*Q.* As I left the room your brother, the bankrupt, spoke to you. What did he say to you?

"*A.* My brother?

"*Q.* Yes. Mr. Durgan, is that competent?

"Mr. Boardman—Certainly; the witness is on the stand, and he spoke to the bankrupt, or the bankrupt spoke to him.

"The Witness—I will have to ask him (indicating the bankrupt).

"Mr. Durgan—See what he said.

"The Bankrupt—I will tell you.

"Mr. Boardman—Never mind.

"The Witness—He said in regard to when I paid the $18,000. I should have—it should have been mentioned there that $1,000 was deposited, and that there was $17,000 instead of saying $18,000.

"*Q.* That is what your brother told you, is it?

"*A.* Yes, sir.

"*Q.* You had forgotten that?

"*A.* I had forgotten that. I supposed, in fact, you would take it for that."

It is impossible to reconcile this evidence with any theory of a beneficial ownership of this property vested in Williams A. Hunt. Either he was in such darkness as to the transactions as to discredit any notion that he owned it, or he was engaged in a conspiracy with his brother to conceal the true facts concerning the purchase. The conclusion necessary to be drawn from that hypothesis is the same as the other, for if Williams was the true, beneficial owner, there was no reason for the concealment of the fact that the purchase price had been paid by his own checks.

He went further in his examination before the referee. He

stated that this $18,000 cash had been taken from a mahogany money box, which he owned, and in which he kept a portion of his wealth. This box had contained, according to his account, $80,000 on January 1st, 1907. The origin of this fund, as accounted for, in the bankruptcy proceeding, was his honest toil for a period of a few years. He was cross-examined further as to this fund of $80,000, in the present case, and he testified that it had its origin in two very remarkable gambling transactions, each of which netted him the precise sum of $15,000. This fund of $80,000 has been used, if the Hunt brothers are to be believed, in paying for the property in question, and in the purchase from Fred of other portions of his estate, and for no other purpose. I am forced to the conclusion that the story of this fund of $80,-000 is a fable.

As has been said, the $10,683.86 actually paid to Mrs. Beecher was drawn from a bank account in the Bankers Trust Company standing in the name of Williams A. Hunt. The body of these checks were, in each instance, written by Fred Hunt. They were merely signed by Williams, and Williams testified that Fred Hunt had full authority to sign checks on this account. Williams' ignorance as to the facts in connection with this account is equal to his lack of information as to the facts relating to the purchase of the property. The account was originally opened with the Mercantile Trust Company, which company was afterwards merged with the Bankers Trust Company. Williams has never been either to the Mercantile Trust Company nor to the Bankers Trust Company. He does not know how long he has had the account. He never "bothered" with his bank deposit book. He does not know when the merger between the two trust companies took place. He says that part of the money in this account came out of the mahogany box, but he cannot tell how much of the money that came out of the box went into the bank account.

When, in November, 1912, he was examined in the bankruptcy proceedings, he could not tell whether he then had a check book for this account or not. He could not then recall the number of checks he had drawn on this account during the year 1912. He could not tell whether it would be more than twenty or less

than twenty. In fact, he had "no recollection whatsoever." The one definite assertion that he ventured to make was, that his balance in this account on January 1st, 1912, was about $10,-000. A copy of this account was produced in this cause and showed the balance on that day to have been $758.48.

On the other hand, Fred M. Hunt had complete dominion over this account. He drew all the checks and could sign any check that he chose to sign.

The check for $1,000, of November 20th, 1911, mentioned above, was produced and offered in evidence before the referee in bankruptcy. It bore the serial number 7100. An examination of a copy of this account, furnished by the banks, shows this check as the sixth withdrawal. A later check, in this same series, is numbered 8. On the stand, Fred Hunt admitted that the number had been changed, but denied that any sinister purpose had prompted the alteration.

A small pocket check book, purporting to show this account, was produced before the referee. From the cross-examination of Williams Hunt in this cause it appears that the earlier stubs had been torn out from this book, and all the entries intended to show the dealing with the account in question were crowded upon two stubs. This book should have shown the three Beecher checks. But, if it did, counsel who examined the witness apparently failed to detect it.

This check book, though called for by the complainant, was not produced at the trial of this cause. Fred Hunt was examined as to the method employed in keeping this check account. He stated that each check was entered upon a corresponding stub. It is evident, therefore, that the stub check book produced before the referee was not a genuine document.

It is quite evident, therefore, that the money that went into the purchase of this property was the money of Fred M. Hunt, though drawn from an account carried in the name of his brother.

The property was conveyed by Mrs. Beecher to Williams A. Hunt, subject to a second mortgage of $6,500. This mortgage was paid off on January 8th, 1912, by three checks of Fred M.

Hunt, drawn on the Battery Park National Bank, two of which were drawn to the order of one Katz.

After the election of Mr. Trask as trustee, Fred M. Hunt produced before the referee and delivered to Mr. Trask a bundle of about three hundred checks, drawn on the Battery Park account, covering a period of several years. He also produced a bundle of checks drawn on an account that he carried in the Mechanics and Metals National Bank of New York, and six checks drawn on an account in the Bankers Trust Company, standing in his own name.

He also produced what purported to be a stub check book on the Battery Park National Bank, another on the Mechanics and Metals bank. He testified that his bank book and stub book on the Bankers Trust Company account had been "lost in the shuffle." This last account, by the way, was by far the largest account carried by Fred M. Hunt, showing deposits during a period of eighteen months of $89,344.99, and except for the months of January, February and April, 1912, this account was the least active of all his numerous accounts.

The three so-called Katz checks were not among the large bundle of Battery Park checks delivered to Mr. Trask. It is quite apparent that they were withheld; and further, that the stub check books delivered to Mr. Trask at the same time were manufactured for the occasion. There are many things that point to this conclusion. Only one need be referred to—that is, that the checks covering the period in question, all, or practically all, bore the vignetted picture of a ship with an appropriate motto. The checks remaining in the stub book bore no such vignette. Yet, Fred M. Hunt had testified before the referee, speaking of these checks and stub books: "I will not say they correspond in number, but *they were taken from those books.*"

In the face of this testimony, the story of these brothers, to the effect that Williams gave Fred $6,500 in cash with which to pay this mortgage, which money Fred gave out in driblets to his customers and friends, and gave in its place his own checks in payment of the mortgage, is entitled to little, if any, weight. The brothers contradicted each other as to the date of this pay-

ment by Williams to Fred, and the friend that they bring in to corroborate them, contradicts them both. That this mortgage was paid by Fred M. Hunt with his own money is proved to my satisfaction.

Since the purchase of this property there has been erected upon it a stable and a garage. The stable was erected by William L. Blanchard, or what seems to be the same thing, by the William L. Blanchard Company.

There was paid to Blanchard, on account of this work, $17,-250. Of this sum, $7,000 was paid by six checks drawn by Fred M. Hunt on his account in the Bankers Trust Company. Fred M. Hunt now admits giving three of these checks, or $3,500, but the payment of the whole $7,000 is so completely proved by Blanchard's books and the records of the Federal Trust Company of Newark and the Bankers Trust Company of New York, that counsel for defendant did not attempt to dispute the fact. Before the referee, however, Fred had testified, speaking of the checks drawn on this very account, as follows:

"*Q.* Do you want to swear that none of these went to William L. Blanchard?

"*A.* No, sir.

"*Q.* None of them did?

"*A.* No, sir.

"*Q.* Did any of them go to the Newark contract?

"*A.* No, sir.

"*Q.* Did any go to Newark?

"*A.* No, sir; I don't think so."

These are the checks that have been "lost" by Fred M. Hunt.

Two thousand dollars of this $17,250 was paid by checks drawn on accounts standing in the name of Hunt Brothers. But it is clear that Fred M. Hunt's signature alone was recognized by the banks. Two other checks were given to Blanchard, one for $750 and one for $500, drawn on the Newark Trust Company, on an account opened by Fred M. Hunt on May 8th, 1912, in the name of Williams A. Hunt. When Fred opened this account, he filed with the bank a power of attorney from Williams, authorizing him, Fred, to sign Williams' name to checks and notes. At the time Fred opened this account, he had broken with the complainant, he was heavily indebted to the Mechanics

and Metals National Bank, and his balance in the Bankers Trust Company was reduced to $105.97. He had made every preparation to fail. During the preceding two weeks he had given notes to five of his creditors. There had been recorded a deed of his home property to his friend Fred Brown, an assignment to Blanchard of a mortgage of $4,500, an assignment to his sister of an interest in another mortgage, and on the same day, an assignment of his interest in his uncle, Samuel I. Hunt's estate to Williams A. Hunt, for a stated consideration of $12,000.

These two payments to Blanchard, made by checks on this account, were clearly made with Fred's money.

The mortgage of $4,500, assigned to Blanchard as above mentioned, was assigned without consideration, and when redeemed by two payments of $2,000 and $2,500, respectively, credits for those sums were given by Blanchard on account of this construction work.

The balance of the payments to Blanchard were made in cash by Fred M. Hunt, who took receipts therefor in the name of his brother.

Other and smaller sums were paid to other contractors, while the evidence in connection with these payments is not as clear and satisfactory as in respect to the payments of Blanchard, yet the preponderance of evidence is in favor of their having been made by Fred M. Hunt. There is no satisfactory proof of their having been made by Williams A. Hunt.

It is therefore clear that Fred M. Hunt was, at the time of the filing of the bill in this cause, and at the time of the filing of the petition in bankruptcy, by virtue of a resulting trust, the sole beneficial owner of the premises described in the bill of complaint.

The cross-bill seeks further to set aside a conveyance of a one-half interest in a certain mortgage given by one Churchman to Fred and Williams A. Hunt. This half interest Fred assigned to Williams by assignment dated October 10th, 1911, which assignment was not recorded, however, until April 27th, 1912. On the last-mentioned day, Fred M. Hunt handed to Blanchard this assignment, together with a deed of his home, made out to

34

Fred Brown, and an assignment of the $4,500 mortgage above mentioned. He asked Blanchard to have the deed and the assignment of the Churchman mortgage recorded in the Essex county register's office. Blanchard understood the errand and performed it through his own attorneys, as the records show. It is not necessary to rely upon the declarations of Fred M. Hunt made to Blanchard to find this assignment fraudulent. Fred had the custody of this unrecorded assignment six months after the date of its execution. There are no witnesses to the payment of the consideration for this assignment. Williams says that he got the money, $1,150, to pay Fred out of his pocket. That seems to him a perfectly satisfactory explanation as to the source and origin of this fund.

Williams A. Hunt's alleged reason for not recording the assignment is practically a confession of fraud.

"*Q.* Was there any reason connected with your brother why you did not record these papers and these instruments at the time when they were given?

"*A.* I thought more than likely he would regain his feet again—come to the front; that he being a brother of mine, I did not want to publish him all over. * * *

"*Q.* Did you say anything to him about the hazardous character of his business or anything like that?

"*A.* Nothing more than that I thought he was not doing extra good, as he wanted to be borrowing all the time."

The foregoing was brought out by his own counsel upon direct examination.

This admission has a double bearing on the case. It was argued by counsel for the Hunts that it was impossible to believe that Fred and Williams had begun as early as December, 1911, to make plans for the protection of Fred's property from his creditors. Yet, here we have Williams testifying that that object was in his mind as early as October 10th, 1911.

My conclusion is that this assignment of the Churchman mortgage was given by Fred and accepted by Williams with the intent to hinder, delay and defraud the creditors of Fred, and is therefore void. Williams is chargeable with one-half of the interest collected upon this mortgage since its assignment to him.

I shall advise a decree in accordance with these views.