WILLIAMS A. HUNT, complainant,

*v.*

FREDERICK M. HUNT, defendant.

[Decided May 9th, 1932.]

*Messrs. Lindabury, Depue & Faulks,* for the complainant.

*Mr. Merritt Lane,* for the defendant.

BACKES, V. C.

The relief sought is three-fold: For an accounting of moneys received upon trust; for a partnership accounting, and for a restoration of the title to land.

The suit is by Williams A. Hunt, dull and, to all appearances, subnormal, against his brother, Frederick M. Hunt. The limit of Williams' capacity is that of a hostler; he knows horses, and little else. Business experience he has none. Although possessed of an inheritance, he has never made a bank deposit or drawn a check; others did it for him, and had to. Fred is shrewd and unscrupulous. By inclination he is a horse trader; by occupation he was a broker on the produce exchange. The brothers lived with their mother

until she died in 1908; thence with their sister, Mrs. Jaques, until the latter part of 1924, when Fred married and went his way. He dominated his slow-witted brother, who, confiding and easily led, followed him submissively.

In 1904, Williams and Fred formed Hunt Brothers, a partnership, to conduct a livery stable business in Newark, which lasted until 1924, shortly before this bill was filed. The partnership prospered; in later years it dwindled into insignificance, when the automobile came. Williams was the stableman. Fred conducted the business end, kept the books and handled the finances. He kept three Hunt Brothers' accounts in as many banks in New York, against which he alone could draw, and did; and he was not always careful to confine the withdrawals to the firm's transactions. With these accounts and the business affairs generally, Williams had no concern; he hadn't the wit. In all the years he withdrew but $700, mostly in small lots, from the firm. In June, 1911, Fred gave him a check for $5,500, half the cash in bank, he taking the rest. It is a fair surmise that about this time Fred conceived the idea of concealing his assets in Williams' name to cheat his creditors.

In December of 1911, Fred induced Williams to purchase a plot of land on Washington street, Newark, for a livery stable and garage. Williams paid the purchase price, some $11,500, out of his inheritance and assumed two mortgages, one for $15,000, and a second for $6,500. Fred engineered the deal. The holder of the $6,500 mortgage started foreclosure and Fred paid him off without consulting Williams, afterwards taking his note for the amount; that was the first hiding in the scheme of concealment.

Fred, then, in Williams' name, contracted with William A. Blanchard Company, a builder, to erect the stable and garage. He negotiated the contract and supervised the construction. The total cost was approximately $38,000. Williams advanced some of the cost, about $8,000, and the rest was furnished by Fred out of his own and partnership funds. To cover up, Fred took Williams' note for $9,000, for money supposedly advanced to him up to that time towards paying for the structure; his second step in the concealment.

Needing money to pay the bills, Fred obtained a loan of $10,800 from the Battery Park National Bank, New York, upon false pretense. That was on April 1st, 1912, and within the month he conveyed some of his seizable property to one Brown, and the rest to Williams, and, on September 11th following, filed a petition in bankruptcy in New York and a false schedule of his assets, of $9 cash and a worthless note of one Hedden for $7,686. His hidden assets, including the two notes he held of Williams, $15,500, and his partnership interest, were, of course, omitted. The day following, he was adjudged a bankrupt, and later a trustee was appointed. Shortly before the bankruptcy, the Battery Park National Bank levied an attachment, issued out of our supreme court, against the stable and garage property, and filed a bill in chancery in aid of the writ, in which the trustee later intervened and took over the prosecution of the suit which resulted in a decree declaring that Williams held the property in trust for Fred. *Battery Park National Bank* v. *Hunt, 83 N. J. Eq. 521; 91 Atl. Rep. 804; affirmed, sub nom. Hunt* v. *Trask, Ibid. 680.* Fred controlled the defense; his lawyers conducted the trial; Williams was his pawn. Fred and Williams flagrantly perjured themselves in the bankruptcy court and at the trial before Vice-Chancellor Lewis, in the telling of a fanciful story, concocted by Fred and his New York lawyer, that Williams paid for the plot of land and the cost of the stable and garage out of an $80,000 cache in a box in a trunk at his house. Absurd and grotesque, they stuck to the story. The truth would have saved Williams' investment, but also would have exposed Fred's concealment of his assets. A petition to file a bill for review, in which only half the truth was told, was denied and the denial was affirmed by the court of errors and appeals. *84 N. J. Eq. 501; 96 Atl. Rep. 1101.*

Cornered, Fred capitulated and make overtures for settlement. His first proposition, prepared by Williams' then recently retained lawyer, addressed to Fred's New York lawyer for transmission to the trustee, was that Williams would pay all the debts and costs, over a period of years, and secure the payment by a mortgage on the garage. Mrs. Jaques held

an $11,000 judgment, by assignment from the builder recovered on a mechanics' lien on the garage, which was to be subordinated. Satisfaction of the chancery decree would have left the title to the stable and garage property in Williams. Fred saw the drift, and, while Williams' lawyer was away on vacation, had his, Fred's, New York lawyer draft another settlement agreement by which Fred, Williams and Mrs. Jaques were to pay the debts and costs, over a period fixed, and Fred was to procure Brown, in whose name he had concealed his Washington street house, to convey it to the trustee as additional security to the decree which had alreay vested the title to the garage property in the trustee; the trustee was then to convey both properties to Fred, who in turn, was to execute to the trustee a mortgage on them to secure the payment; Mrs. Jaques was to postpone her judgment and Williams was to hand over to the trustee some of the property Fred had concealed in his name. These things being done, all litigation was to cease. The conveyances were made to the trustee, and Mrs. Jaques canceled her judgment, but the deed by the trustee to Fred and the mortgage by him to the trustee were not executed. The trustee held on to what he had and after three or more years, when Fred had made all payments, conveyed the garage to Fred. Williams wants the title restored to him. He claims that he signed the settlement agreement under pressure by Fred, and upon the representation that it was demanded, in the form it was drawn, by the trustees' solicitor, which was untrue, and that all would be lost unless he signed; he says he did not understand, but having confidence in Fred, he signed. We have no question that Williams did not see in the document Fred's twist to the course of the title, or, seeing, that he understood it; a few hours observation of him in the witness chair is quite satisfying of his denseness.

In deciding what should be done, we are ever mindful that we are dealing with the testimony of confessed perjurers and consequently consider nothing proved unless by their statements against interest or by supporting documents, independent evidence or by circumstances well established; their conflicting testimony standing alone is rejected as unworthy.

The existence of the partnership is conceded, but Fred claims that there were periodic settlements during its continuance and a final settlement in June, 1911, when he gave Williams the check for $5,500, half the money in bank, and that the partnership came to an end. On May 16th, 1912, a certificate was filed in the Essex county clerk's office, signed and sworn to by Williams, that he, Williams A. Hunt, was transacting and intended to transact the business under the name of "Hunt Brothers." Fred had the certificate prepared and Williams signed on the dotted line. He opened an account in Williams' name in a local bank, of which he had power of attorney, in which he transacted the partnership business and much of his own until 1920, when he felt able to resume in his own name, having paid off his bankruptcy debts. The continuance of the partnership to the time the family relationship ceased in 1924—actively in the earlier period until 1917, desultorily until 1920 and indifferently thereafter—is amply established by the transactions, the books, admission by Fred and by his conduct. The business had run down, we may say run out, but not the partner relationship; nor has there ever been an accounting. It is certain that Williams never got his share, and particularly the $19,500 he contributed toward the purchase price of the garage property and the cost of construction of the garage. He is entitled to an accounting.

The certificate was unquestionably false and a fraud upon the statute. The document was the hands of Williams, but its inspiration was the voice of Fred to cheat his creditors, and Williams in his stupid way knew and reluctantly aided. It does not lie in Fred's mouth to raise a conventional estoppel nor to interpose the moral issue as a defense, but the court may and always does spurn a tainted complaint. Equity's contempt is not of the sinning supplicant, but only of his sinful complaint. Williams can have nothing of his contract of co-partnership that occurred after he falsely certified that he alone owned the business, for to grant him relief as to that would countenance his fraud, but he is not to be denied his rights up to that time; they are not infected by his later

iniquity. To refuse him that relief would be disciplinary, and equity is not vengeful.

The proofs disclose a number of transactions involving the handling of Williams' funds by Fred, apparently distinct from the partnership but, in reality, they will be found to be partnership funds or so intermingled with them that most of them may be taken into the reckoning in the partnership accounting.

Fred, for a time, collected Williams' income from the Samuel I. Hunt estate and, of a total of $30,000, has accounted for all but one installment of $70.40. That this one, like the rest, was not deposited to Williams' credit is not satisfactorily established.

Fred bought the homestead on Washington street in 1905. There can be little doubt that it was a family affair, for at that time Williams and Mrs. Jaques each advanced to Fred $2,000; the purchase price was $6,500. For the earnest money of $250, Fred drew a partnership check, which was not used. Williams' check for $2,000 is in evidence and the endorsements seem to link it to the transaction, but whether it was a loan or a contribution towards the purchase price is not clear. Fred maintains it was a loan and Williams says it was given in the general line of business. We agree with counsel for Fred, without deciding, that "it was given to Fred M. Hunt in the usual course of the business of Hunt Brothers, for use in that business." It will stand as an item in the partnership accounting.

The brothers purchased a home in Rahway, before moving to Newark, each contributing half the purchase price. After they moved to Newark in 1904 they sold it for $5,000, taking back a mortgage from Wheller, the purchaser, for $4,850. The mortgage was purchased by Mrs. Jaques shortly after Fred went into bankruptcy, and the proceeds found their way either into the partnership account then being carried on by Fred in Williams' name in the Newark Trust Company, or it was laid out in paying for the garage then in the course of construction. The item forms a part of the partnership accounting, as do the rents of the property col-

lected by Fred before the sale to Wheller and used in the partnership business, of which he kept a record in the firm's books.

There were two mortgages of $4,500 each taken in the names of Fred and Williams Hunt, known as the Randolph mortgages. These were investments, in part, of Hunt Brothers' funds. When the mortgages were paid off, the proceeds went into Hunt Brothers' account and formed part of the balance in bank of $11,000, which Fred split with Williams in June, 1911. The contention of Fred that this was a final accounting and a termination of the partnership, already adversely disposed of, finds rebuke in the fact that Williams gave Fred, out of his private fund, a check for $2,250, his one-half of the second $4,500 Randolph mortgage, the other half being taken from the partnership. A proper apportionment required that Williams be repaid his individual advance and the balance divided. Fred must also account for the interest on these mortgages.

The Randolph-Wright mortgage appears to have been a personal investment of Fred. It was assigned by him to the builder of the garage and was later purchased by Mrs. Jaques.

Fred admits making an investment of $1,250 out of Williams' funds in a mortgage of Jettie Auerback, and that he later cashed it. He accounted for only $999. He is responsible for the difference and the interest.

The second Auerback mortgage of $4,000 made to Fred was his property, paid for by his funds.

An accounting of the rents of the Belmont avenue house will be eliminated. One Jeffrey executed to Williams a mortgage for $2,750 on the property. He owed the firm, Williams says, $1,250, and that $1,443.83 was drawn from his account in a Newark bank to make up the difference. Fred says that Jeffrey owed the firm but $300 and that the difference was made up by two checks, one for $1,000, the other for $1,443.83 drawn on Williams' account for which he (Fred) had first deposited the cash. The firm's books show that the mortgage debt was made up of $1,250 notes and the balance in cash. The mortgage was taken in Williams' name and later, upon foreclosure of a prior mortgage, the title was taken in Wil-

liams' name and he still has it. A new mortgage was given
to the complainant in foreclosure for the principal debt, and
the expenses were paid in cash. They were Fred's transac-
tions. The mortgage was taken while he was in the meshes
of the bankruptcy litigation; the deed, after he had ar-
ranged the settlement. Williams wants an accounting of the
rent collected by Fred since 1916. Williams apparently
claims but a half interest in the property. Fred contends
that he gave him a half interest in settlement of money he
contributed toward the building of the garage. It is imma-
terial whether either is telling the truth as to the source of
the mortgage-money, for the lien of the mortgage was spent
by the foreclosure sale, and it is an outstanding fact that the
title to the fee was taken in Williams' name by Fred to con-
ceal the property from his creditors; so we must leave the
parties where they find themselves. Williams, in all likeli-
hood, knew nothing of the mortgage, but it is felt that, though
dense, he realized Fred was still hiding his assets from his
creditors as he had previously done and in which Williams
tried to help him even by perjured testimony.

The Churchman mortgage of $2,300, in the names of Wil-
liams and Fred, was an investment by each of $1,000, and of
$300 due to the partnership. Fred fraudulently assigned his
half interest to Williams before the bankruptcy. Fred caused
the mortgage to be foreclosed and bought the property at
sheriff's sale in Williams' name, afterwards selling it at a
profit., taking back a $2,000 mortgage. Williams claims
Fred has not accounted for the interest or for Williams' share
of the profit. The proofs show that Williams' received the
entire proceeds of the $2,000 mortgage. The excess payment,
Fred says, with the one-half interest in the Belmont avenue
house just mentioned, was in settlement of moneys Williams
spent on the garage. This is regarded as an explanation but
not a fact. Though Fred's interest in the mortgage was
assigned in fraud, and the title in the foreclosure suit was
taken in Williams' name to defraud creditors, Williams should
account for the excess in the general accounting he seeks from
Fred. Fred is not a supplicant; he is not to be penalized.

The Delmarle mortgage was surrendered to Williams at the trial. Williams holds the tax title and further accounting is not required.

Williams' claim to the ownership of the Washington street garage property by way of a resulting trust arising out of his payment of the purchase price of the land must be denied. A resulting trust would ordinarily arise in Williams' favor from the payment of the purchase money (*Phillips* v. *Phillips, 81 N. J. Eq. 459; 86 Atl. Rep. 949; 83 N. J. Eq. 345; 91 Atl. Rep. 1070*), but circumstances may countervail the equitable doctrine of resulting trusts. It is not entertained when to maintain it results in harm. Like all other measures in equity, exact justice must flow from its exercise. To award it to Williams would be a greater injustice than to allow it to remain in Fred. He paid towards it approximately $20,000, while Fred's contribution was $30,000 and more. Williams did not buy this property for himself. Fred directed the purchase and Williams understood that it was to be used for a costly stable and garage for which he knew he hadn't the capital; he had exhausted his bank account in the payment of the purchase price. It is our opinion that the purchase was made for the partnership, that the stable and garage were to be used in carrying on the partnership business, and that the moneys laid out for the buildings were partnership contributions. Fred's attitude is that he alone is the owner of the garage property, he having the title from the trustee in bankruptcy; and we may add with propriety, by again over-reaching his weakling brother. The stand is not unassailable. Under our decree in the Battery Park National Bank suit, title was declared to be held in trust for him by Williams and by force of the statute it vested in the trustee, but only to the extent that it was needed for creditors; anything over remained in Williams, the joint fraud-doer, and it is questionable whether the trustee had the power to reconvey the property to anyone but Williams. Williams' authority to the trustee, in the settlement agreement, to convey it to Fred was special and limited, and obviously it was not exercised according to the strict letter of the power. Further, there is not much question that Wil-

liams was duped into signing the settlement agreement. Be that as it may, Fred's claim of absolute ownership must be subordinated to Williams' appeal for the money he advanced in the confidence of its security by reason of the purchase of the property in his name, and Fred will be ordered to account for the money advanced by Williams in its purchase and in its improvement.

Both counsel advance interesting arguments and cite a mass of authorities on the question of Williams' right to recover, he having given perjured testimony in the bankruptcy hearings and before this court that the garage property and the structure were paid for by him out of cash he kept in a box in a trunk at his home. The perjury was Fred's cunning idea, taught, and spoken parrot-like, to Williams. Williams' perjury impeaches his veracity as a witness in this cause, but relief is not to be withheld if his rights are otherwise established and are not infected by his iniquity. The sinner, however corrupt, is not denied relief in equity unless the right he seeks to vindicate is tainted with sin. "The inequity which deprives a suitor of a right to justice in a court of equity is not general iniquitous conduct unconnected with the act of the defendant which the complaining party states as his ground or cause of action; but it must be evil practice or wrong conduct in the particular matter or transaction in respect to which judicial protection or redress is sought." The unclean hands' doctrine is applicable only to cases where the particular claim is tied up to the inequitable conduct as an element of its creation. *Neubeck* v. *Neubeck, 94 N. J. Eq. 167; 119 Atl. Rep. 26.* ."It [the maxim of unclean hands] must be understood to refer to willful misconduct in regard to the matter in litigation, and not to misconduct, however gross, which is unconnected therewith and with which the opposite party in the cause has no concern." *Shotwell* v. *Stickle, 83 N. J. Eq. 188; 90 Atl. Rep. 246.* "The maxim * * * is confined to misconduct in regard to, or at all events connected with, the matter in litigation, so that it has in some measure affected the equitable relations subsisting between the two parties, and arising out of the transaction." *Weidman Silk Dyeing Co.* v. *East Jersey Water Co., 88 N. J.*

*Eq. 397; 102 Atl. Rep. 858.* "Clean hands means a clean record with respect to the transaction with the defendant and not with respect to any third party." *American Association, Ltd.,* v. *Innis (Ky.), 60 S. W. Rep. 388.* In *Woodward* v. *Woodward, 41 N. J. Eq. 224; 4 Atl. Rep. 424,* Vice-Chancellor Van Fleet held that a husband could not be denied a divorce for his wife's adultery, on the ground of unclean hands, because he connived in a second act of adultery by her. The doctrine of unclean hands has no applicability to the suit in hand. Williams' wickedness in the prior suit, his perjured testimony as to the source of the money used to purchase and improve the garage property, manufactured by Fred, spoken by his puppet and perpetrated upon Fred's creditors to defeat seizure of the property in satisfaction of their debts, did not make unclean the co-partnership obligations and Williams' right, that springs from it, to an accounting from Fred for the money contributed by him and for his share of the profits. His misconduct was not an element in the creation of his rights in the partnership or in the consequent right to an accounting; it is unconnected with the present litigation and in no manner affects the equitable responsibility of Fred to account to Williams for partnership property. Williams' falsehoods were inequitable to Fred's creditors, but not to Fred's co-partnership. Fred cannot cry unclean hands, nor is the doctrine to be invoked to his advantage. The circumstances that the garage property, concerning the ownership of which Williams gave false testimony, may eventually be requisitioned to satisfy a decree upon the accounting is purely incidental and not of the substance of the doctrine of unclean hands.

Fred also claims immunity from accounting because, as he contends, Williams is guilty of perjury in the giving of testimony in the pending cause, relying upon the doctrine of unclean hands as applied in *Clickner* v. *Clickner, 95 N. J. Eq. 479; 123 Atl. Rep. 373; Gluck* v. *Rynda Development Co., 99 N. J. Eq. 788; 134 Atl. Rep. 363,* and *Pfender* v. *Pfender, 104 N. J. Eq. 107; 144 Atl. Rep. 333,* and a long line of cases from other jurisdictions, wherein it is laid down that a suitor's complaint will not be rejected for impropriety of

conduct in the cause, as in *Journal Plaza Holding Co.* v. *J. L. H. Co.*, *105 N. J. Eq. 290; 147 Atl. Rep. 581.* The indictment is regarded as not established in point of fact. There is no evidence of willful false swearing. Williams, on occasion, in respect of some details, may not have spoken the truth, but it is not evident that the departures were intentional or malicious. His testimony and the manner of it put patience to the test, but, considering his mentality, it is not to be stigmatized as false or to be denounced as perjury.

It is contended that the decree in the Battery Park National Bank suit is *res adjudicata* and bars recovery of the garage and of a partnership accounting. The decree recites that Williams holds the property upon a resulting trust in favor of Fred, upon a finding of fact, upon the false testimony, that Fred paid the purchase price. It has already been held that Williams is not entitled to the property and his prayer in that respect having been denied, the question of *res adjudicata* is academic; but if it were involved, we fail to see that it would be an estoppel. The decree was entered on the issue charging that the property was held in trust for Fred in fraud of his creditors, and the recital that Fred furnished the purchase money was in demonstration of the fraud. While the finding of fact was essential to the conclusion of fraud, the recitals, however couched, permit of no broader construction than the issues raised and decided, and was not an adjudication of the rights and liabilities of the defendants *inter sese*, then not in issue, litigated or determined. The decree does not establish a resulting trust in favor of Fred, but, finding that it existed, condemned it as fraudulent as to creditors. It was not a ruling as between Williams and Fred, to the advantage of the latter. Upon satisfying creditors the decree would be spent and upon motion would be vacated, leaving the title in Williams. At all events, the decree does not work an estoppel upon the partnership accounting and an accounting of Williams' private funds handled by Fred, to which the relief sought is confined.

Fred also seeks to estop Williams on the ground of laches. The continuity of the confidential relation between the two brothers, in which Fred dominated, and of the partnership,

down to the time Fred left the common home in the fall of 1924, and the filing of this bill in January, 1925, alone are a complete answer. Fred's reason that time has dimmed his memory as to some of the transactions does not excuse him from accounting. He should have kept a meticulous record of his fiduciary responsibility.

The elapse of time, as a factor in laches, is that which expires after the trust ceases and up to the bringing of the suit. That Williams is barred from an accounting of the partnership transactions after 1912, because of his false certificate, does not mark an interruption of the fiduciary relationship at that time.

There will be a reference to a master to state an account in accordance with the views herein expressed.