14 N.J. Super. 58 (1951)
81 A.2d 394
THOMAS W. HUGHES, PLAINTIFF-RESPONDENT,
v.
RUDOLPH EISNER, DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued April 23, 1951.
Decided May 22, 1951.
*60 Before Judges EASTWOOD, BIGELOW and FREUND.
Mr. Armand F. Jones argued the cause for the respondent (Miss Dorothy V. Reeve, attorney).
Mr. Rudolph Eisner argued the cause pro se.
The opinion of the court was delivered by BIGELOW, J.A.D.
Plaintiff-respondent instituted this action in the Chancery Division to annul an agreement for fees to be paid to his attorney, the defendant-appellant, and also to recapture part of the fees that had already been paid. An answer was filed, evidence was presented, and a judgment rendered that appellant forego any additional charge against respondent over and above the sum already received by him. Hughes v. Eisner, 8 N.J. Super. 351 (Ch. Div. 1950).
Briefly the facts are as follows: Respondent had been in the employ of the Eureka Flint & Spar Company for nearly 20 years. On August 5, 1938, ten days after the termination of the employment, he retained the appellant to represent *61 him in connection with a claim against the Eureka Company for damages due to silicosis contracted by him while employed by that company. He agreed to pay appellant "out of the proceeds of any recovery, whether by settlement, suit or otherwise, reasonable compensation for his services." Appellant forthwith looked into the facts and began negotiations with the former employer. By Fall it was evident that a satisfactory settlement could not be obtained in this manner, and that the institution of an action at law was advisable. Under date of November 21, 1938, the parties entered into a new contract, by which respondent agreed to pay appellant 50 per cent of whatever might be recovered from the Eureka Company over and above taxed costs and disbursements. The suit was instituted in the Mercer Circuit Court and the company promptly interposed the statute of limitations among other defenses. This defense was struck late in 1939. Hughes v. Eureka Flint, etc., Inc., 20 N.J. Misc. 314 (Circ. Ct., 1939). Judge Jayne comments in his conclusions in the present action that "The defendant (appellant) thus achieved an eventful and most advantageous legal victory for his client. The plaintiff's employer evidently became alarmed and peace overtures were consequently forthcoming." The litigation was settled by an agreement executed July 2, 1940. The company paid Hughes $2,500 and agreed to pay him $30 a week more so long as he might live, and also to keep in force at its own expense $2,000 of life insurance, payable to respondent's wife and family. At the same time, respondent and his attorney, the appellant, revised the fee contract. Appellant relinquished his right to repayment of disbursements, and consented to reduce his share of the weekly payments from one-half to one-third of each payment, and lastly he waived any interest in the proceeds of the insurance policy. At the time the action was begun in the Chancery Division, the respondent had received, pursuant to his settlement with the Eureka Company, $17,620, out of which appellant had been paid $6,290 for his services and disbursements.
*62 The appellant argues that the complaint against him should have been dismissed pursuant to the principles referred to by the maxim, He who comes into equity must come with clean hands. The respondent, in his testimony, denied that he had signed the agreement with the defendant, dated November 21, 1938. His denial was material to the issues. Judge Jayne found that it was false; he characterized it as a deliberate falsehood.
The clean hands maxim seems to have been first mentioned in our reports in 1870. Derby v. Derby, 21 N.J. Eq. 36, 40 (Ch. 1870, Runyon, C.). For 50 years thereafter, references to it were infrequent but they can be read in almost every volume of the New Jersey Equity Reports published after the First World War. In Clickner v. Clickner, 95 N.J. Eq. 479 (Ch. 1924), where the petitioner had attempted to impose upon the court by false testimony, the court said that denial of relief might well be rested upon that ground "somewhat akin to the ordinary application of the equitable principles which require a suitor for equitable relief to do equity and to come into court with clean hands." This was reiterated in Pfender v. Pfender, 104 N.J. Eq. 107; affirmed 105 N.J. Eq. 247 (E. & A. 1929); Meyer v. Blacker, 120 N.J. Eq. 35 (Ch. 1936), and Clark v. Watts, 10 N.J. Super. 283 (Ch. 1950). These cases, or some of them, were cited in A. Hollander & Son, Inc. v. Imperial, etc., Corp., 2 N.J. 235, 247 (1949), but the court cautioned, "The doctrine, however, is not so rigid nor should it be so construed as to allow or permit an unconscionable gain to the wrongdoer at the complainant's expense." The discretionary nature of the whole clean hands doctrine was stressed by Judge Jacobs in Medical Fabrics Co. v. D.C. McLintock Co., 12 N.J. Super. 177 (App. Div. 1951). We may add that the extension of the doctrine so as to lead to the dismissal of a suit on the ground of perjury, regardless of the injury done to the plaintiff by the defendant, seems to be peculiar to our State. We consider that the refusal of Judge Jayne to dismiss respondent's case on the grounds that we have been *63 considering, was well within his discretionary power and should not be disturbed by us.
Many years ago, Chancellor Green said that where an attorney takes from his client a bond or other security as compensation for his services, "the transaction is regarded as constructively fraudulent, in consequence of the confidential relations between the parties and the means of undue influence which the attorney may exert over his client. The bond or other security will not be set aside as void, but it will be suffered to stand as a security for the amount justly due upon it, and the burthen will be thrown upon the attorney of showing its perfect fairness, adequacy and propriety." Brown v. Bulkley, 14 N.J. Eq. 451, at 458 (Ch. 1862). This principle was applied by our court of last resort, in a case where the client had transferred land to his attorney as security for the amount due him. The court made a radical reduction in the fee, saying: "Even if it be conceded that the complainant agreed to the charge, yet a court of equity would not sanction it except upon proof of its perfect fairness." Porter v. Bergen, 54 N.J. Eq. 405 (E. & A. 1896). See also Lynde v. Lynde, 64 N.J. Eq. 736 (E. & A. 1902). In Colgan v. Jones, 44 N.J. Eq. 274 (E. & A. 1888), it was said that an arrangement for a contingent fee is "always under judicial control; for, being made by guess-work, a species of (perhaps innocent) gambling, it would be dangerous to decline such control as a matter of public policy." In Kelley v. Schwinghammer, 78 N.J. Eq. 437 (Ch. 1911), the attorney had begun an action at law on a promissory note given him by his client in settlement of legal services. Acting on the principle of Brown v. Bulkley, Vice-Chancellor Leaming sustained a bill to enjoin prosecution of the action and to determine the amount justly owing to the attorney.
Soper v. Bilder, 87 N.J. Eq. 564 (Ch. 1917), grew out of a contingent fee agreement. The court said: "it seems to me that upon such an agreement being called in question by a client it will be sustained only to the extent of securing to the attorney reasonable compensation under all the circumstances *64 of the case, which is but another way of saying that the contract under such circumstances will be entirely disregarded. In computing what is reasonable compensation many elements must be taken into account. There is no yardstick by which the value of legal services can be measured; no rate per diem or percentages can be employed with justice to both parties. The legal ability of the attorney, the amount of work which he does, the skill with which he does it, and, of much importance, the amount involved, and the success of his efforts. There may also be considered the contingency that in case he is unsuccessful he will receive nothing, and the fact, if it be a fact, that the fund was created through the efforts of the attorney."
The appellant protests that the passages we have quoted are in large part dicta, unnecessary to the decision of the cases in which they were written and therefore that they do not settle the law. We recall the observation of one of the judges in Sorrell v. Smith, A.C. 700, 743; 13 B.R.C. 1, 43 (H. of L. 1925): "No `guidance' is more misleading, no `kindly light' is more of a will-of-the-wisp, than an obiter dictum sometimes contrives to be." A source of weakness and confusion in the development of New Jersey case law has been the emphasis both court and counsel have frequently put on what judges have said rather than upon what courts have adjudged. But when the judges of our highest courts over a period of nearly a century have concurred in their officially stated view of a legal problem and there are no adjudications to the contrary, we consider the dicta to constitute a reliable witness to what is our law.
On the authority of the cases above cited and others of like effect, the learned judge who sat in the Chancery Division correctly held that a court of equity may inquire into the fairness and reasonableness of a contract entered into by attorney and client concerning the compensation of the attorney, and that the court may, if the facts warrant, revise or cancel such a contract. He further held in effect that the court need not limit its inquiry to the situation *65 existing when the contingent fee contract was made, but as long as the contract remains executory in part, the supervisory power of the court continues. Here, too, we consider that Judge Jayne was correct. This authority of the court grows from the confidential relation between the parties and also from the fact that an attorney-at-law is a high officer of the court, entrusted with unique powers and subjected to a peculiar standard of conduct. Even though the contract was fair, and fairly made, the court, upon finding that the attorney has been fully compensated both for his services and for the risk he ran that he might be paid nothing at all,  the court may decree, as in this instance, that the attorney forego additional pay. Yet a contract of this nature, fair and reasonable in its terms, and freely agreed to by the client after mature deliberation, with full knowledge of the situation, should not be carved away by the court except in an entirely clear case. As pointed out by Chancellor Runyon, "If such agreements cannot be enforced, there must be many cases in which the poor will be unable to assert their rights." Hassell v. Van Houten, 39 N.J. Eq. 105 (Ch. 1884). This is even truer today than when he wrote, for the expense of litigation has increased greatly with the years.
In the case before us, the services of appellant extended over a period of two years, during which he must have given a very considerable amount of time to respondent's business. Appellant was diligent and skillful and his work was rewarded with a large measure of success. His client received, up to the time this action was begun, $17,620 in addition to the insurance, and is receiving additional compensation at the rate of $1,560 a year. But appellant might have been utterly unsuccessful, in which event his client would have recovered nothing, and appellant would not even have been repaid his disbursements. The chance he ran was substantial, and must be accepted as an important factor in determining what was a reasonable fee. On the whole, we conclude that this is not such a clear case that the Chancery *66 Division was justified in putting an immediate halt to the further operation of the contract.
The judgment will therefore be reversed with directions to dismiss the complaint, but without costs to either party in the Chancery Division or on the appeal.