39 N.J. Super. 294 (1956)
121 A.2d 62
ROY POLLINO, PLAINTIFF,
v.
DAGMAR POLLINO, DEFENDANT.
Superior Court of New Jersey, Chancery Division.
Decided February 24, 1956.
*296 Messrs. Wilentz, Goldman, Spitzer & Sills (Mr. Warren Wilentz, appearing), attorneys for plaintiff.
Mr. David I. Stepacoff, attorney for defendant.
MARIANO, J.S.C.
Plaintiff, Roy Pollino, filed a complaint for divorce against his wife, Dagmar Pollino, alleging adultery commencing in August of 1953 and running to January 8, 1954. Defendant's answer denied the alleged adultery and, as a separate defense, stated that plaintiff had been guilty of such misconduct as to disentitle him to relief, and that defendant comes into court with unclean hands.
Plaintiff, prior to his marriage to the defendant, had been married to one Mabel Devoe in March 1919. While the marriage to Mabel Devoe Pollino was in full force and effect, plaintiff committed adultery with his present wife, Dagmar Pollino, who was then 17 years of age and rendered her pregnant. Thereafter, on May 24, 1921, the plaintiff bigamously married the defendant, Dagmar Pollino, in Richmond County, New York, and lived with her continuously as man and wife until October 1946.
In the affidavit for license to marry executed by the plaintiff in New York in May 1921 (at the time of plaintiff's marriage to the defendant), Roy Pollino, though living in Perth Amboy, New Jersey, falsely swore that his place of residence was 142 Main Street, Tottenville, New York. In said affidavit, Roy Pollino further falsely swore that the proposed marriage to the defendant was his first marriage; he also perjuriously swore that he had no former wife living or dead at the time; and he further stated falsely "that no legal impediment existed as to the right of the applicants to enter into the marriage state."
On November 11, 1921 Raymond Roy Pollino was born to the parties to this suit.
On January 16, 1932 plaintiff, while continuing to cohabit with the defendant, sought to remove the impediment of the valid subsisting marriage to Mabel Devoe Pollino. Roy *297 Pollino filed a petition for divorce in the Court of Chancery of New Jersey on the ground of desertion. Mabel Devoe Pollino did not contest the suit.
In his testimony in support of the suit for divorce against Mabel Devoe Pollino, Roy Pollino swore that Mabel Devoe Pollino left him on March 20, 1920, one year after the marriage. Roy Pollino further testified in the hearing for divorce from Mabel Devoe Pollino that he sought out his then wife on the following morning (March 21, 1920) at which time she refused to return to him. In the said hearing Roy Pollino testified that he solicited Mabel's return one or two days thereafter (March 22 or 23, 1920), again without success. Thereafter, Roy Pollino testified in the divorce proceeding against Mabel Devoe Pollino that some five years later (1925) he again asked Mabel Devoe Pollino to return, and again his advances were repulsed. At the time of this alleged solicitation in 1925 Roy Pollino was actually living with Dagmar Pollino and his child, Roy, Jr., born of Dagmar Pollino, at Jacques Street, Perth Amboy, New Jersey.
As a result of this testimony by Roy Pollino a decree nisi was advised in favor of Roy Pollino and against Mabel Devoe Pollino on October 20, 1932.
On July 12, 1933 Roy Pollino again went through a ceremonial marriage with the defendant Dagmar Pollino; this time the ceremony was performed in the Borough of Brooklyn, New York. On the occasion of this second marriage to Dagmar Pollino the plaintiff once again falsely swore. This time he swore that he was residing at 299 Central Avenue, Jersey City, New Jersey, when in fact he was continuing to reside with the defendant, Dagmar Pollino, at Jeffries Street, Perth Amboy, New Jersey.
The parties continued to reside together thereafter until October 1946. Plaintiff, Roy Pollino, had testified in the case at bar that a few years prior to 1947 he discovered that his wife, Dagmar Pollino, had a propensity for consorting with other men. Roy Pollino left his wife in 1946 and in 1947 instituted divorce proceedings (Docket No. 161/462) charging his wife with adultery alleging the same to have been *298 committed in the latter part of January 1946 and continuing to the early part of February 1946, in West Palm Beach, Florida, and at various other times and places. Roy Pollino admits that he continued to live with her as man and wife until October 1946.
The defendant, Dagmar Pollino, in answer to the divorce proceedings instituted against her in 1947, denied the alleged adultery and filed a counterclaim for divorce alleging adultery having been committed by Roy Pollino at various times and places.
On December 13, 1948 Roy Pollino withdrew his petition for divorce; Dagmar Pollino withdrew her counterclaim.
From October 1946 until the present time the parties have not resided together. Roy Pollino admits that he made no effort to restrain his wife from consorting with other men since his departure in October 1946.
The case at bar was instituted by Roy Pollino in June 1954, charging Dagmar Pollino with adulterous conduct on various dates from August 1953 through January 8, 1954. Roy Pollino admits that he knew in the summer of 1953 that his wife was seen in the company of her alleged paramour; he stated that he obtained this information from a private investigator named Linn. Roy Pollino states that on four separate occasions (November 27, 1953, December 2, 1954, and on January 6 and 8, 1954) he, personally, saw his wife in the company of her alleged paramour.
In the State of New Jersey divorce and nullity proceedings are regarded as equitable in nature. Being regarded as equitable in nature, various defenses available in courts of equity have been applied with the approval of our courts in divorce and nullity proceedings. Gibbs v. Gibbs, 92 N.J. Eq. 542 (Ch. 1921). Among the equitable defenses urged successfully in our courts, in divorce proceedings, has been the doctrine of unclean hands, 1 Herr, Marriage, Divorce and Separation (1938), § 149, p. 155; in fact, the court has *299 on its own motion invoked the doctrine. Ancrum v. Ancrum, 9 N.J. Misc. 795, 797 (Ch. 1931).
An extended discussion of the doctrine of unclean hands is not necessary; nevertheless, attention is directed to Gluck v. Rynda Development Co., 99 N.J. Eq. 788 (Ch. 1926).
The doctrine of unclean hands in equity matters has been expressed to be applicable in 30 C.J.S., Equity, § 99, pp. 496, 497 in the following terms:
"Equity will not open its doors to one who seeks its aid for the purpose of violating a contract, or who seeks to enforce alleged rights arising from a contract which he himself breached. * * *" Citing Pike v. Pike, 100 N.J. Eq. 486 (Ch. 1927) with approval.
The doctrine of unclean hands has alternatively been expressed as follows: "Equity will not aid a fraud doer," Herder v. Garman, 106 N.J. Eq. 13 (Ch. 1930); "He that hath committed iniquity shall not have equity." 2 Pomeroy, Equity Jurisprudence (5th ed. 1941), § 397, p. 90.
"`Unclean hands,' within the meaning of the maxim of equity, is a figurative description of a class of suitors to whom a court of equity as a court of conscience will not even listen, because the conduct of such suitors is itself unconscionable  i.e., morally reprehensible as to known facts."
Vulcan Detinning Co. v. American Can Co., 72 N.J. Eq. 387 (E. & A. 1906).
Not only must a suitor come into equity with clean hands but he must keep them clean after his entry and throughout the entire proceedings, A. Hollander & Sons, Inc. v. Imperial Fur Blending Corp., 2 N.J. 235 (1949).
The rule is that while general iniquitous conduct will not operate to bar plaintiff from relief by reason of unclean hands, iniquitous conduct relating to the particular matter or transaction to which judicial protection is sought will operate to bar relief. See 1 Herr, Marriage, Divorce and Separation (1938), § 149, supra. Where the relief sought by the plaintiff is the result of his own wrongdoing, where the unclean hands of the plaintiff has infected the very subject matter in litigation, the plaintiff is barred from relief in a court of equity.
*300 In the instant case we look to the plaintiff's conduct with respect to the marriage in litigation; if plaintiff's inequitable conduct is tied up to the marriage as an element of its creation, then he is barred from relief by reason of his unclean hands. Hunt v. Hunt, 10 N.J. Misc. 675 (Ch. 1932); Neubeck v. Neubeck, 94 N.J. Eq. 167 (E. & A. 1922). Let us examine, then, the agreed facts to determine if plaintiff has unclean hands; and if so, let us inquire whether plaintiff's unclean hands is an element for consideration in the marriage which plaintiff now seeks to dissolve.
The plaintiff husband had committed adultery while married to Mabel Devoe Pollino. Plaintiff had bigamously married the defendant in 1921. Subsequently, in 1932, the plaintiff endeavored to change his marital status  to rid himself of his first wife (Mabel Devoe Pollino). The legal avenues available were, indeed, fraught with pitfalls. To resort to annulment proceedings was impossible since he (Roy Pollino) was the offending party, who knowingly entered into the bigamous marriage. As a matter of law, he could not prevail. Tyll v. Keller, 94 N.J. Eq. 426, 427 (E. & A. 1922); 1 Mercer Beasley L.R. 61 (1932).
Under these circumstances, the only other possible avenue of approach to change the marital status of Roy Pollino was by divorce proceedings. This he undertook to do in 1932 by misrepresenting to the Court of Chancery that Mabel Devoe Pollino had deserted him. At the hearing Roy Pollino completely in disregard of his oath perjuriously testified to having made bona fide advances for the return of Mabel in March and April 1920, and five years later in 1925. In truth, Roy Pollino had been bigamously married to the present defendant in 1921 and was cohabiting with the present defendant and the child born of their cohabitation from 1921 through the time he allegedly made bona fide advances for Mabel's return in 1925. In fact, at the very same time Roy Pollino was seeking judicial relief in our courts (1932) from the marriage to Mabel Devoe Pollino, he was bigamously and adulterously cohabiting with the defendant, Dagmar *301 Pollino at Jeffries Street, Perth Amboy, New Jersey. Such, then, was the character of the plaintiff who sought to invoke the conscience of the Court of Chancery.
Based upon his patently perjurious testimony and upon the fraud which Roy Pollino visited upon the then Court of Chancery, a decree nisi was advised in plaintiff's favor in October 1932. Plaintiff had succeeded by deceit and perjury to change his marital status. See Docket No. 88/185.
Having successfully perpetrated a fraud upon the court Roy Pollino, now a single man of record, proceeded to change his marital status again. This time (July 12, 1933) he married Dagmar Pollino for the second time, and again the plaintiff's perfidy becomes manifest; again he swore falsely. In the application for the marriage license made in Brooklyn, New York, he represented his residence to be Jersey City when, in fact, it was Perth Amboy. The reason plaintiff resorted to a false statement of residence is evident: to have made application for the marriage license in Perth Amboy (where he truly resided) would have rendered the plaintiff vulnerable to criminal investigation  and plaintiff could not run the risk of having his marital escapades exposed to the searching eyes of the law lest not only be his marital scheme exploded but, also, lest he find himself faced with criminal charges.
Comes now Roy Pollino, adulterer  bigamist  perjuror, into the Chancery Division again, and asks for a change in his marital status. He seeks to have the marriage to Dagmar Pollino dissolved, a marriage which is valid on the record only by reason of his own perjurious testimony in the Mabel Devoe Pollino divorce proceedings which resulted in a decree in his favor.
It is the court's opinion that plaintiff's unclean hands should not be permitted to soil the cloak of justice. A studied disregard for the fundamental principles of morality and a complete disregard for the solemnity of the oath has pervaded the plaintiff's marital excursions: plaintiff wearied of his marriage to Mabel and adulterously proceeded to satisfy his sexual appetite with Dagmar, an inexperienced *302 girl of 17 years. Having rendered Dagmar pregnant, plaintiff proceeded to lead her into a bigamous marriage of which she had no knowledge. Seeking to thrust the stigma of bigamy from himself, plaintiff proceeded to obtain a divorce from Mabel Devoe Pollino notwithstanding the fact that in so doing, he willfully hid from the court his nefarious activity with Mabel and Dagmar. And finally, the plaintiff finds himself caught in the web of his own iniquity: now his remarriage to Dagmar appears to be valid of record and now, in the very same marriage which resulted from the plaintiff's imposition upon the Court of Chancery, he alleges his wife has committed adultery! Is this plaintiff to be allowed to invoke the conscience of the court in the very same marriage which is the end product of his perfidy? This marriage was engendered by the plaintiff's iniquitous conduct and yet, temerously this plaintiff would again seek to invoke the aid of this court. It takes but little conjecture to find the contempt which plaintiff holds for courts of justice generally and this court in particular.
An examination of the reported cases dealing with the application of the unclean hands doctrine where the conduct of the moving party with respect to the subject matter of the suit has been tainted with fraud or perfidy, follows: Prindiville v. Johnson & Higgins, 93 N.J. Eq. 425 (E. & A. 1922); Clickner v. Clickner, 95 N.J. Eq. 479 (Ch. 1924); In Piper v. Piper, 13 N.J. Misc. 68 (Ch. 1934), where the parties had each been previously adjudicated guilty of adultery, 116 N.J. Eq. 587 (E. & A. 1934), the wife's application for separate maintenance was dismissed by reason of her unclean hands. The court would not neutralize the meretricious conduct of each of the parties. The application of the doctrine of unclean hands in a divorce proceeding is also to be found in Pfender v. Pfender, 104 N.J. Eq. 107 (Ch. 1929), affirmed 105 N.J. Eq. 247 (E. & A. 1929); Zearfoss v. Zearfoss, 112 N.J. Eq. 530 (Ch. 1933).
Divorce proceedings are regarded in this State as sui generis: the State is represented by the "conscience of the *303 court," Feickert v. Feickert, 98 N.J. Eq. 444 (Ch. 1925). Should then the conscience of the court lend a sympathetic ear to the pleas of the plaintiff in the case sub judice? To do so would stamp with approval the deceit, misrepresentation and perjury practiced by Roy Pollino on our court.
In the discussion which follows the case of Langley v. Devlin, 95 Wash. 171, 163 P. 395 (Sup. Ct. 1917), appearing in 4 A.L.R. 32 reference is made to the nature of the misconduct which justifies application of the maxim of unclean hands. Weegham v. Killefer (1914), 215 F. 168, 171 (D.C. Mich. 1914), affirmed 215 F. 289, 131 C.C.A. 558, L.R.A. 1915A, 820 (6 Cir. 1914), is quoted as follows:
"Under this maxim, any willful act in regard to the matter in litigation which would be condemned and pronounced wrongful by honest and fair-minded men will be sufficient to make the hands of the applicant unclean. Both courts and text-writers have repeatedly spoken upon this subject in no uncertain language... He who has acted in bad faith, resorted to trickery and deception, or been guilty of fraud, injustice, or unfairness, will appeal in vain to a court of conscience, even though in his wrongdoing he may have kept himself strictly `within the law.'" (Italics ours)
Applying the rule above set forth to the case at bar, I find that Roy Pollino has not sparingly committed all of the unconscionable acts which separately would operate to invoke the doctrine of unclean hands:
Bad Faith  Roy Pollino represented to the court in the Mabel Devoe divorce proceedings that he had made bona fide advances to Mabel for her return in 1925, when in truth he was at that time adulterously and bigamously cohabiting with Dagmar Pollino the present defendant.
Trickery and Deception  In the Mabel Devoe proceedings Roy Pollino consciously withheld from the court his adulterous cohabitation with Dagmar Pollino so that the court might be tricked by his deception to advise a decree nisi in his favor. Also, in each of the two affidavits for marriage license made by Roy Pollino in New York State for marriage to the present defendant Dagmar Pollino, Roy Pollino swore falsely: in the 1921 application he represented the proposed marriage as his first when in fact he was then married to *304 Mabel Devoe Pollino; and in both the 1921 and 1933 affidavits for marriage license Roy Pollino deliberately misrepresented his residence in order that he might obtain the marriage license.
Fraud  The bad faith, trickery and deception hereinabove adverted to patently prove not only equitable fraud but also legal fraud: Roy Pollino lied; he knew he lied; he lied with intent to deceive the New York marriage licensing authority, the Court of Chancery in New Jersey, and the defendant, Dagmar Pollino; each of the parties upon whom he perpetrated his fraud relied upon the lies; each of the parties were damaged. Licenses to marry were improperly issued, a decree nisi was improvidently granted, and the defendant, Dagmar Pollino, innocently changed her status from a single woman to bigamist (in 1921), and her subsequent marriage of 1933 to Roy Pollino became subject to attack by reason of the fraud which Roy Pollino perpetrated upon the Chancery Court in 1932 when he perjuriously secured the second divorce from Mabel Devoe Pollino.
4 A.L.R. 69 refers to Primeau v. Granfield, 193 Fed. 911, 912, 114 C.C.A. 549 (2 Cir., 1911), certiorari denied 225 U.S. 708, 32 S.Ct. 839, 56 L.Ed. 1267 (1912), wherein the court stated:
"Interwoven with these elementary equitable principles are those considerations of public policy which require the fostering of common honesty. A court of justice does not sit for the promotion of fraud or illegality. It is no part of its function to aid any party to a fraudulent or illegal scheme in carrying it out; in adjusting its accounts, or in dividing its spoils."
It is the function of the courts of our State to foster common honesty and not to promote fraud or illegality by aiding a party to a fraudulent scheme. To allow plaintiff's application for divorce would ex necessitu stamp with approval the prior fraudulent, deceptive and perjurious tactics by which he was able to acquire his status of an unmarried person to the end that he might thereafter marry the defendant.
*305 While it is true that the clean hands philosophy is not to be applied where it will disserve the interest of justice or restrain the just exercise of the court's discretion, White v. White, 16 N.J. 458, at 464 (1954), not to apply the doctrine in the instant case would result in violence to equity, justice and good conscience. Plaintiff's conduct formulates a substantial basis for the application of the doctrine. Were it to be otherwise it would permit a bigamist, who perjuriously secured a divorce from his first wife and remarried his second wife, to dissolve the marriage to his second wife  a marriage which is valid of record only because of his fraud upon the court; and would permit him to seek the aid and assistance of this court to complete his nefarious scheme. His hands are unclean; his conduct unconscionable and morally reprehensible.
The complaint is dismissed.