952 A.2d 533

VIONIA A. HAGEMAN, PLAINTIFF, v. 28 GLEN PARK ASSOC., L.L.C., EXPRESS HOMES, L.L.C., CHRIS FRANK A/K/A CHRISTOPHER RICHARDSON, MARNIN RAND, HOME ADVANTAGE, L.L.C., A/K/A HOME ADVANTAGE PLUS, L.L.C., MAURICE WOLF, JOHN ZOE, ABC, DEF, JOHN DOE, RICHARD ROE, SAM SOE (SAID NAMES BEING FICTITIOUS), JULIA ALI, ALON RAND, DEFENDANTS.

CHRISTOPHER E. HAGEMAN, PLAINTIFF, v. 28 GLEN PARK ASSOC., L.L.C., EXPRESS HOMES, L.L.C., ALON RAND AND DAVID GROVE, DEFENDANTS.

Superior Court of New Jersey
Chancery Division Special Civil Part Essex County

Decided February 1, 2008.

*Gabriel H. Halpern*, for plaintiff Christopher E. Hageman (*Pinilis Halpern, LLP*, attorneys).

*Kenneth J. Fost*, for plaintiff Vionia A. Hageman (*Kenneth J. Fost, PA*, attorneys).

*Matthew Fredericks*, for defendants (*David Kessler & Associates, LLC*, attorneys).

KLEIN, J.S.C.

The motion under consideration brings into focus the classic equitable maxim of "unclean hands." Defendants, 28 Glen Park Associates, L.L.C., Express Homes, L.L.C., Alon Rand and David Grove, seek to dismiss the complaint brought against them based upon the conduct of plaintiff, Christopher E. Hageman (hereinafter sometimes referred to as "Hageman" or "plaintiff").[1]

The operative facts predate the filing of this action. On or about March 15, 2004, Champion Mortgage filed a foreclosure complaint against Christopher E. Hageman and Vionia A. Hageman, his wife, under docket number F–5181–04, with respect to property at 28 Glen Park Road, Glen Ridge, New Jersey (the "property"). Hageman apparently concealed the existence of the foreclosure action from his wife. A final judgment of foreclosure was entered on January 24, 2005.

On May 17, 2005, the day the property was to be sold at a foreclosure sale by the Essex County Sheriff, Hageman appeared before this Court on an emergent application to stay the sale. In support of the application, Hageman filed a certification stating that the reason for the request was "refinancing for the property." He testified under oath that his father, a retired lawyer, had agreed to loan the money to redeem the property but was out of the country at that time. He volunteered the information that his father was on a two-week cruise aboard the "Queen Mary." When the bank's attorney pointed out that there was no proof of a loan other than the applicant's bare assertions, the transcript of the hearing reflects that Hageman responded: "I wouldn't come here and swear to the sheriff knowing—being raised by an attorney, if that were not true, if his intentions were not valid and were not truthful and honest."

---

[1] The motion addresses only the complaint of Christopher E. Hageman, and does not affect the separate action brought by his wife, Vionia A. Hageman. The two actions have previously been consolidated.

Further, in order to overcome the concerns about the lack of documentation of financing, Hageman stated as follows:

But I can swear because I'm not—I'm not a liar, I'm not a thief, I've never done drugs, I can be a knucklehead at times because I'm a son, but my father gave me his word and that's all I have to go on because, again, as I said, it's not for me. It's for my girls.

Hageman added that his father had begun to "pull money out from various places" with the assistance of an accountant, whose name he provided. He further stated that his wife had left him during the last two years, that he stood to lose the down payment he had put down, and that he, his children and grandmother would have nowhere to go.

Despite the foregoing, the court expressed its reluctance to stay the sale, but was willing to extend the right of redemption beyond the statutory ten-day period. Hageman then became emotional and tearful, and made a last-ditch plea as follows:

I allowed this to happen to myself. I understand that ... I can—all I can do—you know, ma'am, all I've ever had is my word. And I'm sorry I'm talking too much. I'm extremely scared. I apologize. But I can promise you that all these bills will be paid ... I have enough—I have enough to deal with my girls in therapy wondering where their mom is. But for the grace of God, they have been—they have had enough fortitude to—they do fantastically in school.

At the conclusion of the hearing, the court granted a stay of the sheriff's sale to June 14, 2005.

Discovery in this action, including depositions of Hageman's wife and father, has exposed that virtually everything said by Hageman was false. His father was unaware of the foreclosure, had not agreed to provide money to pay off the bank, had not used the named accountant for years, had not taken a cruise, and had never in his life been aboard the "Queen Mary." Moreover, Hageman's wife had never left him, his grandmother did not live at the property, and the down payment for the property had come from his father. Finally, his wife had never abandoned the family and his daughters had not been in therapy for anything.

The sale eventually took place on June 28, 2005. Defendant 28 Glen Park Associates was the successful bidder for the amount of $321,000.

On July 7, 2005, Hageman again appeared in court on an emergent basis to extend the time for redemption. According to the transcript, he represented that he had entered into a contract to sell the property to an entity known as Property Solutions (unrelated to defendants) for a price of $220,000, and that an additional thirty days was needed for "everything to go through." He also stated that he needed time to "move [his] grandmother." Further, Hageman falsely indicated, as at the previous hearing, that he was raising his children on his own. An extension was granted. As best the court can determine, all of this was part of his continuing effort to conceal the fact of the foreclosure from his wife and family, and to find a means of saving the marital home.

The events that transpired thereafter prompted the filing of the present lawsuit by Hageman. On December 14, 2005, the Sheriff of Essex County received the redemption payment in the amount of $175,319.07. Discovery in this case has revealed that the funds came from defendant Alon Rand and his brother, Marnin. By deed dated December 14, 2005, Hageman and his wife purportedly transferred their interest in the property to Defendant 28 Glen Park Associates for a stated consideration of $100.[2] In turn, Hageman received a contract (unsigned) to re-purchase his home for $260,000 within six months of the redemption, as well as a lease pursuant to which he was to pay $1500 per month in rent. Following default, defendant Express Homes (alleged successor to 28 Glen Park Associates) instituted an eviction proceeding in September 2006 against Hageman, resulting in a judgment for possession.

Hageman has alleged that the defendants engaged in a fraudulent "mortgage foreclosure rescue scam." The essence of it is that, instead of paying the Sheriff the bid price of $321,000, defendants paid only the redemption amount of $175,319.07. The difference of approximately $145,000, which would have been

---

[2] As a basis for her separate complaint, Vionia Hageman has averred that the signature on the deed is not hers.

surplus monies payable to the Hagemans, was allegedly "stripped." Hageman's complaint asserts numerous causes of action including violations of the federal Truth in Lending Act ("TILA"), 15 *U.S.C.* §§ 1601–1641, the Home Ownership and Equity Protection Act ("HOEPA"), 15 *U.S.C.* § 1639, and the New Jersey Home Ownership Security Act ("HOSA"), *N.J.S.A.* 46:10B–21 to –35.

Defendants contend that the multiple lies told by Hageman constitute a fraud upon the court that renders his hands unclean in this matter. By reason of his fraudulent and inequitable conduct, the present motion seeks to bar him from relief in a court of equity.[3] In opposition, counsel for plaintiff argues that the conduct did not occur in this lawsuit, but relates to a prior foreclosure action. Moreover, it is urged that defendants should not be allowed to get away with violations of law by dismissing plaintiff's case under the doctrine of unclean hands.

It is well established that "a suitor in equity must come to court with clean hands and must keep them clean after his entry and throughout the proceedings." *A. Hollander & Son, Inc. v. Imperial Fur Blending Corp.*, 2 *N.J.* 235, 246, 66 *A.*2d 319 (1949). The clean hands doctrine is "an equitable principle which requires a denial of relief to a party who is himself guilty of inequitable conduct in reference to the matter in controversy." *Glasofer Motors v. Osterlund, Inc.*, 180 *N.J.Super.* 6, 13, 433 *A.*2d 780 (App.Div.1981). One well known treatise has described the effect of application of the doctrine as follows:

> Whenever a party, who, as an actor, seeks to set the judicial machinery in motion and obtain some remedy, has violated conscience or good faith, or other equitable principles, in his prior conduct, then the doors of the court will be shut against him

---

[3] Defendants have also presented proof that in June 2007, Hageman pleaded guilty to criminal charges of falsifying records and uttering a forged instrument. The underlying facts apparently involved his forging the signatures of a Superior Court judge and an attorney on "divorce papers" so as to deceive someone with whom he had a romantic relationship. Because these events bear no relationship to this matter, they play no part in the court's decision.

*in limine;* the court will refuse to interfere on his behalf, to acknowledge his right, or to award him any remedy.

2 Pomeroy, *Equity Jurisprudence,* § 397 (5th ed. 1941).

In *Untermann v. Untermann,* 19 *N.J.* 507, 518, 117 *A.*2d 599 (1955), the Supreme Court provided the following guidance as to the doctrine's applicability:

It is the effect of the inequitable conduct on the total transaction which is determinative whether the maxim shall or shall not be applied. Facades of the problem should not be examined piecemeal. Where fraudulent conduct vitiates in important particulars the situation in respect to which judicial redress is sought, a court should not hesitate to apply the maxim.

However, the maxim has its limitations, is "not an arbitrary rule and calls for the exercise of just discretion" by the court. *Id.* at 518, 117 *A.*2d 599.

The use of unclean hands to dismiss a complaint is not unprecedented, but is done sparingly. It requires the presence of a sufficient constellation of facts so as to summon the discretion of the court to apply the doctrine in a manner required by justice and equity. For example, in *Clark v. Watts,* 10 *N.J.Super.* 283, 77 *A.*2d 188 (Ch.Div.1950), in which a church pastor sought an injunction permanently restraining the congregation from dismissing him, the court *sua sponte* dismissed the action because the plaintiff had deliberately misread the church manual and "torture[d] the clear language" with the purpose of deceiving the court into relying upon the quoted words in his complaint. *Id.* at 285, 77 *A.*2d 188.

Plaintiff is correct that *Clark,* as well as various other cases dealing with the unclean hands doctrine, concern conduct occurring in or relating to the particular matter in which judicial protection is sought. *E.g., Untermann v. Untermann, supra,* 19 *N.J.* at 517, 117 *A.*2d 599; *Johnson v. Johnson,* 212 *N.J.Super.* 368, 384, 515 *A.*2d 255 (Ch.Div.1986); *Prindiville v. Johnson & Higgins,* 93 *N.J.Eq.* 425, 428, 116 *A.* 785 (E. & A.1922). Plaintiff argues that the deception occurred solely in the prior foreclosure proceedings, which are unrelated to the subject matter of the complaint in this case. However, it is evident that plaintiff has an

unduly restrictive and crabbed view of the facts. He ignores the reality that his applications for extensions of time created the opportunity for the transaction with defendants. Plaintiff enabled and affirmatively sought the arrangement of which he now complains. He petitioned, under false pretenses, for a postponement of a sheriff's sale that would have yielded the surplus funds that were allegedly "stolen" from him. Subsequently, he procured an extension of the redemption period to allow him to negotiate with defendants for a means of saving the property and concealing the foreclosure from his family.

There is an even more direct connection between the foreclosure action and the present case, as an examination of plaintiff's initial pleading reveals. Hageman placed the facts surrounding the adjournment of the sheriff's sale at issue in this very case. In Paragraph 21 of the Verified Complaint, he stated as follows:

Rand provided Hageman with a written loan commitment which he instructed Hageman to present to the court in order to obtain the adjournment. The court granted a one-month adjournment of the sheriff's sale. As soon as Hageman walked out of the courtroom, Rand demanded the commitment letter be returned to him.

The gravamen of plaintiff's case, that defendants engaged in an orchestrated and elaborate "foreclosure rescue scam," is alleged in the foregoing excerpt to have encompassed the adjournment of the sheriff's sale. Stated differently, plaintiff characterized the event as an example of defendants' manipulations.

However, the transcript of May 17, 2005, belies the version of the facts set forth in the complaint. Thus, not only does plaintiff's own pleading rely upon proceedings in the prior action, but it can be inferred that he has continued the pattern of misrepresentation in the present matter.[4] It is obvious that the present litigation is

---

[4] As a further example, defendants cite to a certification in this case in which Hageman portrays the failure to pay his mortgage to the loss of his job with the Newark Housing Authority, as the result of absenteeism after a traumatic incident at work. However, defendants demonstrated that the default occurred on July 18, 2003; the Complaint in Foreclosure was filed on March 15, 2004, and plaintiff admitted in his deposition that *his employment was not terminated*

very much about the underlying foreclosure action, and includes issues about when, why and with whom Hageman appeared in court in May 2005.

Nevertheless, plaintiff contends that the unclean hands doctrine has been eroded to the point that courts no longer use it to dismiss a plaintiff's complaint. Plaintiff also argues that courts have not applied the doctrine where to do so would allow a wrongdoer to profit at the plaintiff's expense. He cites *Hughes v. Eisner*, 14 *N.J.Super.* 58, 62, 81 *A.*2d 394 (App.Div.1951), where notwithstanding false testimony by plaintiff, the trial judge's refusal to dismiss plaintiff's case was not disturbed on appeal. The Appellate Division, while noting the discretionary nature of the clean hands doctrine, directed that the complaint be dismissed on other grounds. In *A. Hollander & Son, supra,* 2 *N.J.* at 247, 66 *A.*2d 319, the court cautioned that the doctrine "is not so rigid nor should it be so construed as to allow or permit an unconscionable gain to the wrongdoer at the complainant's expense." Primarily, plaintiff relies on *Glasofer Motors v. Osterlund, Inc., supra,* for what he refers to as the "modern view." Plaintiff maintains that *Glasofer Motors* stands for the proposition that where the defendant is a wrongdoer, engaging in predatory conduct in violation of law and public policy, unclean hands will not bar a plaintiff's suit.

In *Glasofer Motors,* the Appellate Division reversed a dismissal of the plaintiff's private antitrust action under the Sherman Act and State Antitrust Act. 180 *N.J.Super.* at 19, 433 *A.*2d 780. The trial judge found that plaintiff had willfully misrepresented itself as an authorized distributor or dealer of Diamond Reo trucks in order to submit a bid to the City of Newark on a parts contract. *Id.* at 13, 433 *A.*2d 780. When plaintiff refused Osterlund's demand to withdraw its bid, Osterlund refused to sell Diamond Reo parts to plaintiff. The Court found that "[p]laintiff's willful

---

*until October 25, 2004.* Moreover, at the May 17, 2005, hearing, the transcript reflects that he placed blame for his financial troubles on the fact that he was "working so much that [he] didn't know what was going on." That, of course, is totally contradictory.

misrepresentation constitutes bad faith and shocks the court's conscience. This unconscionable act undeniably forms part of the basis of this lawsuit. Defendants' actions arose as a direct result of plaintiff's conduct." *Id.* at 13, 433 *A.*2d 780. For those reasons, the trial court had held that the unclean hands doctrine barred Glasofer Motors' action.

Plaintiff's reliance on *Glasofer Motors* is misplaced. That case is distinguishable from the case at bar both factually and legally. Its holding clearly is confined to cases alleging violations of the antitrust laws. The opinion contains a lengthy discussion of the federal cases that have abolished the defense of unclean hands in private antitrust actions, except in situations involving a plaintiff who has participated with defendant in conduct violative of the antitrust laws. The federal cases expressly reveal an intent not to "undermine the antitrust acts," so as "to further the overriding public policy in favor of competition." *Id.* at 14, 433 *A.*2d 780. The decision in *Glasofer Motors* was simply a harmonization of state law with "ruling judicial interpretations of federal antitrust statutes." *Id.* at 19, 433 *A.*2d 780. Hence, "a plaintiff's illegal conduct independent of any antitrust violation *does not bar his private antitrust suit* which vindicates a public wrong." *Id.* at 19, 433 *A.*2d 780 (emphasis added).

The most glaring distinction is that we are not dealing here with an antitrust plaintiff or antitrust claims. Secondly, according to Hageman's latest version of the facts, his conduct was directed, motivated and intertwined with defendants' alleged scheme. Most importantly, *Glasofer Motors* furnishes no support for plaintiff's theory that the unclean hands doctrine has, outside of antitrust cases, been given a blanket rejection, met with criticism, or been labeled as antiquated. To the extent that there is any concern that defendants will escape unscathed, it is noted that the suit by Hageman's wife against these parties and others is continuing.

As stated previously, the doctrine has been employed in cases such as *Clark v. Watts, supra,* 10 *N.J.Super.* at 283, 77 *A.*2d 188. There, the plaintiff minister alleged in his complaint that he was

dismissed by a mere majority vote, and quoted a portion of the church manual allegedly requiring that "a three-quarters vote, of all present at such a meeting should be deemed essential to a call." *Id.* at 285, 77 *A.*2d 188. Upon reviewing the document, the court observed that the language appeared only in relation to a meeting at which a candidate is "called" to the pulpit, and there was nothing requiring a like vote when a pastor is relieved of his duties. The court dismissed the action based upon plaintiff's unclean hands for his "willful misuse of the quoted language," stating as follows:

> The conduct that is material to the doctrine is the plaintiff's misconduct, and if that be of serious nature relief will be denied to the plaintiff, no matter how serious are the charges of wrongdoing laid to the defendant. In the instant case there can be no question that the plaintiff's misconduct was of the most serious nature. His misuse of the church manual was conscious and purposeful. *It was designed to mislead the court into a false assumption of fact and to induce the allowance of an ad interim restraint. Those purposes were accomplished.* The court was deceived and the initial relief sought by the plaintiff was granted. The plaintiff's misconduct, now revealed, disentitles him to further hearing in this court.

[*Id.* at 286–87, 77 *A.*2d 188 (emphasis added).]

The doctrine also has had continued vitality in matrimonial cases. In *Pollino v. Pollino,* 39 *N.J.Super.* 294, 121 *A.*2d 62 (Ch.Div.1956), it was used to dismiss the plaintiff husband's suit for divorce. The court stated that "[w]here the relief sought by the plaintiff is the result of his own wrongdoing, where the unclean hands of the plaintiff has infected the very subject matter in litigation, the plaintiff is barred from relief in a court of equity." *Id.* at 299, 121 *A.*2d 62. The court traced plaintiff's conduct back almost 25 years to 1932, when in order to divorce his first wife he falsely testified that she had deserted him. In reality, he had been bigamously married to the present defendant in 1921 and was living with her and their child. After obtaining the divorce, in 1933 he married the defendant for a second time and misrepresented his residence on the marriage license to avoid a criminal investigation. In the matter then before the court, he sought a divorce from his second wife, the defendant.

The court found from the foregoing facts "[a] studied disregard for the fundamental principles of morality and a complete disregard for the solemnity of the oath has pervaded the plaintiff's marital excursions[.]" *Id.* at 301, 121 *A.*2d 62. It further found that plaintiff had committed bad faith, trickery, deception and fraud, any one of which would have been sufficient to invoke the doctrine of unclean hands. It dismissed the complaint on that basis, as follows:

It is the function of the courts of our State to foster common honesty and not to promote fraud or illegality by aiding a party to a fraudulent scheme. To allow plaintiff's application for divorce would *ex necessitu* stamp with approval the prior fraudulent, deceptive and perjurious tactics by which he was able to acquire his status of an unmarried person to the end that he might thereafter marry the defendant.

[*Id.* at 304, 121 *A.*2d 62.]

*See also Rolnick v. Rolnick,* 262 *N.J.Super.* 343, 362, 621 *A.*2d 37 (App.Div.1993).

The reasoning in *Pollino* is highly appropriate under the facts and procedural history of the present case. It is unnecessary to look back anywhere close to a quarter century as *Pollino* saw fit to do. It was within the year prior to the commencement of this suit that plaintiff appeared before two separate Chancery judges and sought extensions of time based upon a litany of facts that he spun out of the recesses of his own mind. His stories were embroidered with considerable detail, essentially unsolicited. He obtained relief based upon a series of blatant untruths, which set in motion the process under which the property was redeemed and the transactions with defendants were consummated. As in *Clark v. Watts, supra,* he intended to mislead the court into a false assumption of fact so as to obtain an injunctive order, and succeeded in his purpose. Now, plaintiff has come back seeking relief from the transaction that was only made possible by his bad faith, trickery and deception. It is strikingly similar to *Pollino, supra,* 39 *N.J.Super.* at 299, 121 *A.*2d 62, in that the "relief sought by plaintiff is the result of his own wrongdoing," and "the unclean hands of the plaintiff has infected the very subject matter" of the case. It is exacerbated by the pleadings filed in this matter,

which set forth facts completely at variance with the transcripts of plaintiff's previous proceedings.

The unclean hands doctrine, like other equitable maxims, has origins that date back over a century and yet, is still a recognized part of equity jurisprudence. Unclean hands language is bandied about somewhat casually in pleadings and briefs, often appearing as a boilerplate defense in answers filed in the Chancery Division. A fair reading of the case law tells us that its application is actually more limited and should be used sparingly, especially if the result is to preclude access to the courts. Nevertheless, the doctrine exists to be invoked where the totality of the circumstances demand, unless it is to become meaningless, empty verbiage. Equitable maxims should serve as more than buzzwords to trigger equitable jurisdiction. They should have a higher purpose than as flowery "filler" language for legal argument. The maxim of unclean hands was intended to be an available tool for a court of equity's use, "not out of regard for defendant or to punish plaintiff, but upon larger considerations that make for the advancement of right and justice." *Heritage Bank, N.A. v. Ruh,* 191 *N.J.Super.* 53, 71–72, 465 *A.*2d 547 (Ch.Div.1983). *See Untermann v. Untermann, supra,* 19 *N.J.* at 518, 117 *A.*2d 599 ("Condonation by the court of such conduct would not be instrumental in the preservation of justice and the integrity of the court.").

It is not typical for a miscreant of the likes of plaintiff to have the audacity to seek affirmative relief from a court of equity. As a defendant in the foreclosure case, he set out on a mission to deceive everyone—his wife, his father, the court, and even defendants themselves (by falsely representing that he was expecting a sum of money that would enable him to buy back his house). Having accomplished his plan, only to have it backfire on him, he now seeks equitable relief from the consequences. Equity courts, with their unique brand of justice tempered with mercy, are particularly susceptible to this type of chicanery. Plaintiff has already received more favorable treatment than he deserved in the foreclosure action, under false pretenses. Considering the

number of worthy suitors clamoring for equitable relief, it would be the height of injustice to allow plaintiff to sap any further time or attention from this court. To permit plaintiff the potential for recovery would also reward him for his prior deceitful and fraudulent behavior.

Accordingly, plaintiff's complaint is dismissed. A copy of the order is enclosed.